******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DONNA L. SOTO, ADMINISTRATRIX (ESTATE OF
VICTORIA L. SOTO), ET AL. *v.* BUSHMASTER
FIREARMS INTERNATIONAL, LLC, ET AL.
(SC 19832)
(SC 19833)

Palmer, McDonald, Robinson, Vertefeuille,
Mullins, Kahn and Elgo, Js.*

*Syllabus*

The plaintiffs, administrators of the estates of nine victims of the mass
shooting at Sandy Hook Elementary School on December 14, 2012,
brought an action in December, 2014, pursuant to this state's wrongful
death statute (§ 52-555), seeking damages, among other relief, from the
defendants, the manufacturers, distributors and direct sellers of the
semiautomatic rifle that the perpetrator, L, used to shoot the victims.
Sometime prior to March, 2010, the rifle was manufactured by certain
of the defendants, sold to the defendant distributors, and then resold
to the defendant direct sellers, who operated a retail gun store in Con-
necticut. In March, 2010, L's mother purchased the rifle from that store.
The rifle is capable of rapid semiautomatic fire, accommodates large
capacity magazines, and bullets fired therefrom travel at such a high
velocity that they cause a shockwave while passing through a human
body, often resulting in catastrophic injuries, even in areas remote to
the direct bullet wound. On the date of the shooting, L retrieved the
rifle, along with multiple thirty round magazines, drove to the school,
shot his way in, and proceeded to fatally shoot twenty-six people, includ-
ing the plaintiffs' decedents, in less than four and one-half minutes. The
gravamen of the plaintiffs' complaint was that the defendants negligently
entrusted to civilian consumers an assault rifle that is suitable for use
only by military and law enforcement personnel and violated the Con-
necticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.) through
the sale or wrongful marketing of the rifle. The plaintiffs' first theory
of liability was that the rifle is a military grade weapon that is grossly
ill-suited for legitimate civilian purposes such as self-defense or recre-
ation, that the rifle and other similar semiautomatic weapons have
become the weapon of choice for mass shootings and, therefore, that
the risks associated with selling the rifle to the civilian market far
outweigh any potential benefits, that the defendants continued to sell
the rifle despite their knowledge of these facts, and that it therefore was
negligent and an unfair trade practice under CUTPA for the defendants
to sell the weapon, knowing that it eventually would be purchased by
a civilian customer who might share it with other civilian users. The
plaintiffs' second theory of liability was that the defendants marketed
the rifle, through advertising and product catalogs, in an unethical,
oppressive, immoral, and unscrupulous manner by extolling the militaris-
tic and assaultive qualities of the rifle and reinforcing the image of the
rifle as a combat weapon that is intended to be used for the purposes
of waging war and killing human beings. The plaintiffs alleged that the
defendants advertised this rifle differently from how they would promote
and sell rifles intended for legal civilian purposes such as hunting and
recreation. In connection with this second theory of liability, the plain-
tiffs also alleged that the defendants' marketing of the rifle to civilians
for offensive assault missions was a substantial factor in causing the
decedents' injuries in that L's attack, had it occurred at all, would have
been less lethal if L had not been encouraged by the defendants' market-
ing campaign to select the rifle in question as his weapon of choice.
The defendants moved to strike the complaint, contending that all of
the plaintiffs' claims were barred by the Protection of Lawful Commerce
in Arms Act (PLCAA) (15 U.S.C. §§ 7901 through 7903 [2012]), which,
subject to certain enumerated exceptions, immunizes firearms manufac-
turers, distributors, and dealers from civil liability for crimes com-
mitted by third parties using their weapons. The defendants contended
alternatively that the plaintiffs failed to state a legally valid negligent
entrustment claim under Connecticut common law and that their

claims predicated on alleged CUTPA violations were legally insufficient because, among other reasons, the plaintiffs lacked standing under CUTPA, their claims were time barred by CUTPA's three year statute of limitations (§ 42-110g [f]), personal injuries and death are not cognizable damages under CUTPA, and their CUTPA claims were barred by the exclusivity provision of the Connecticut Product Liability Act (§ 52-572n [a]). In granting the defendants' motions to strike the plaintiffs' complaint, the trial court concluded that the plaintiffs' allegations did not fit within the common-law tort of negligent entrustment, PLCAA barred the plaintiffs' claims insofar as those claims sounded in negligent entrustment, and the plaintiffs lacked standing to bring wrongful death claims predicated on CUTPA violations because they never entered into a business relationship with the defendants. On appeal from the trial court's judgment in favor of the defendants, *held*:

1. The trial court correctly concluded that the plaintiffs did not plead a legally sufficient cause of action based on negligent entrustment under this state's common law and, therefore, properly struck the plaintiffs' claims predicated on that legal theory: the plaintiffs failed to establish that the defendants had any reason to expect that L's mother, the direct purchaser of the rifle, was likely to use the rifle in an unsafe manner or in a manner that would involve an unreasonable risk of physical harm; moreover, this court declined the plaintiffs' invitation to expand the common-law doctrine of negligent entrustment to allow such a cause of action to proceed on a theory that it was reasonably foreseeable to the defendants that, following the initial entrustment of a dangerous instrumentality, such as the rifle in question, that instrumentality would come into the possession of someone like L, who would use it in an unsafe manner, and, in any event, it was unnecessary to decide whether, in the present case, a cause of action for negligent entrustment could proceed under such a theory because the plaintiffs did not allege that any of the defendants possessed any knowledge or had any specific reason to believe either that L's mother would share the rifle with L or that L was especially likely to operate it unsafely or illegally; furthermore, to the extent that the plaintiffs were seeking to pursue their negligent entrustment claim on the theory that any commercial sale of assault weapons to civilian users constitutes negligent entrustment because the societal costs of such sales outweigh the perceived benefits, this court followed the lead of other courts in rejecting that theory.

2. The trial court improperly struck the plaintiffs' claims under CUTPA on the ground that the plaintiffs lacked standing because they were third-party victims who did not have a consumer or commercial relationship with the defendants: upon review of the text of § 42-110g (a), the provision of CUTPA creating a private right of action for persons injured by unfair trade practices, and its legislative history, and in light of the broad scope and remedial purpose of CUTPA, this court concluded that CUTPA authorizes any person who has suffered an ascertainable financial loss caused by an unfair trade practice to bring an action under CUTPA, regardless of whether they had a business relationship with the person or entity that engaged in the prohibited practice; moreover, prior case law on which the trial court had relied in striking the plaintiffs' CUTPA claims for lack of standing did not recognize a business relationship requirement, notwithstanding the defendants' claim to the contrary, and, therefore, principles of stare decisis and legislative acquiescence did not require this court to impose a business relationship requirement in the context of this case; furthermore, the defendants could not prevail on their claim that prudential concerns supported the restriction of CUTPA standing to persons who have a direct business relationship with the alleged wrongdoer, as none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supported the denial of standing to the plaintiffs in the present case, in which the link between the allegedly wrongful conduct and the plaintiffs' injuries was far more direct and less attenuated than in other cases in which this court has held that the plaintiffs lacked standing under CUTPA on the ground that the harms alleged were too indirect, remote and derivative with respect to the alleged wrongdoer's conduct.

3. This court concluded that a cause of action for wrongful death predicated on a CUTPA violation must comply with both the statute of limitations applicable to wrongful death claims, § 52-555 (a), which is two years from the date of death and no more than five years from the date of the

act or omission complained of, and the statute of limitations applicable to CUTPA claims, § 42-110g (f), which is three years from the date of the alleged violation, this court having reasoned that any limitation period contained in a statute such as CUTPA, which creates a right of action that did not exist at common law, constitutes an essential element of the cause of action created thereunder, and that, under this state's wrongful death statute, an action will lie only insofar as the decedent, had he or she survived, could have satisfied all of the elements of the underlying theory of liability on which the allegedly wrongful death is predicated; because it was undisputed that the manufacturing, distribution and final sale of the rifle to L's mother all occurred at least three years prior to the commencement of the present action, the plaintiffs' wrongful death claims predicated on the theory that any sale of military style assault weapons, such as the rifle in question, represented an unfair trade practice were time barred by the applicable statutes of limitations, but the plaintiffs' wrongful death claims predicated on the theory that the defendants violated CUTPA by advertising and marketing the rifle in an unethical, oppressive, immoral, and unscrupulous manner were not time barred, as most of the plaintiffs' wrongful advertising and marketing claims were phrased in the present tense and, thus, could be interpreted to allege that the defendants' wrongful conduct continued through the time the complaint was filed, and as at least one allegation reasonably could be interpreted to mean that the defendants' wrongful conduct had occurred at the time of the shootings, which was within the limitation period.

4. The defendants could not prevail on their claim, as an alternative ground for affirming the trial court's judgment, that the exclusivity provision of the Connecticut Product Liability Act, which provides that a product liability claim under that act shall be in lieu of all other claims against product sellers for harm caused by a product, barred the plaintiffs' CUTPA claims that were predicated on the defendants' allegedly wrongful advertising and marketing of the rifle; the defendant failed to establish that those claims amounted to product liability claims, as there were no allegations, for example, that the defendants' advertising and marketing of the rifle contained inadequate warnings that made the rifle unreasonably dangerous.

5. Contrary to the defendants' claim, personal injuries resulting in death that are alleged to have resulted directly from wrongful advertising and marketing practices are cognizable under CUTPA: although the term "actual damages" in § 42-110g (a) is not defined in CUTPA, the use of that term in other statutes led this court to conclude that the term "actual damages" in § 42-110g (a) includes personal injuries, and prior case law supported the conclusion that the term "ascertainable" in that portion of § 42-110g (a) providing that a person who suffers "any ascertainable loss of money or property" as a result of a prohibited practice under CUTPA may recover actual damages in no way restricted the damages that are available to plaintiffs who have been directly and personally injured by an unfair trade practice; moreover, a contrary reading of the statute would be inconsistent with the stated intent of the legislature to provide broad protection from unfair trade practices and to incentivize private enforcement of the law, several other courts from other jurisdictions and a majority of Connecticut trial courts addressing the issue have concluded that victims of unfair trade practices may recover for personal injuries, and Federal Trade Commission rulings and cases decided under the Federal Trade Commission Act (15 U.S.C. § 41 et seq. [2012 and Supp. V 2017]), which the legislature intended would serve as a basis for interpreting CUTPA's open-ended language, supported the view that wrongful advertising that poses a genuine risk of physical harm falls under the broad purview of the Federal Trade Commission Act and, by incorporation, CUTPA.

6. The trial court correctly concluded that CUTPA, as applied to the plaintiffs' allegations, fell within PLCAA's "predicate" exception to immunity for civil actions alleging that a firearms manufacturer or seller knowingly violated a state or federal statute "applicable to the sale or marketing of [a firearm], and the violation was a proximate cause of the harm for which relief [was] sought," and, accordingly, PLCAA did not bar the plaintiffs' wrongful death claims predicated on the theory that the defendants violated CUTPA by marketing the rifle in question to civilians for criminal purposes and that those wrongful marketing tactics caused or contributed to the decedents' injuries:

a. this court's review of the text of the predicate exception set forth in PLCAA, 15 U.S.C. § 7903 (5) (A) (iii), read in the context of the broader statutory framework, led it to conclude that Congress did not intend to preclude actions alleging that firearms manufactures or sellers violated state consumer protection laws by promoting their firearms for illegal, criminal purposes and, therefore, that CUTPA qualified as a predicate statute insofar as it applied to wrongful advertising and marketing claims:

(i) this court concluded that, although the word "applicable" in the predicate exception is subject to more than one interpretation, the most reasonable interpretation of the word is "capable of being applied," in accordance with the word's ordinary, dictionary meaning, and further concluded that, if Congress had intended to create an exception to PLCAA for actions alleging a violation of any law that is capable of being applied to the sale and marketing of firearms, there was little doubt that state consumer protection statutes such as CUTPA would qualify as predicate statutes under PLCAA, because CUTPA prohibits unfair or deceptive acts in the conduct "of any trade or commerce" and thus is capable of being applied to the sale and marketing of firearms.

(ii) if Congress had intended to limit the scope of the predicate exception to violations of statutes that are directly, expressly, or exclusively applicable to firearms, it easily could have used such language, as it had done in other federal statutes.

(iii) because the predicate exception expressly refers to state or federal statutes applicable to the marketing of firearms, and because, at the time PLCAA was enacted, no federal statute and very few state statutes directly or specifically regulated the marketing or advertising of firearms, the only logical reading of the predicate exception was that Congress had in mind other types of statutes, and this court presumed that Congress was aware, when it enacted PLCAA, that both the Federal Trade Commission Act and its state analogues, including CUTPA, had long been among the primary vehicles for litigating claims that sellers of potentially dangerous products, such as firearms, have marketed those products in an unsafe or unscrupulous manner.

(iv) reading the predicate exception to encompass actions brought to remedy illegal and unscrupulous marketing practices under state consumer protection laws was consistent with the approach of the Second Circuit Court of Appeals, which previously held that the predicate exception encompasses laws that clearly can be said to implicate the purchase and sale of firearms, as well as laws of general applicability that courts have applied to the sale and marketing of firearms, into which categories CUTPA squarely fell.

b. The congressional statement of findings and purposes set forth in PLCAA at 15 U.S.C. § 7901 lent support for this court's conclusion that Congress did not intend to preclude under PLCAA the plaintiffs' wrongful advertising and marketing claims brought pursuant to CUTPA:

(i) this court read the congressional statement of findings and purposes to indicate that Congress chose not to abrogate the well established duty of firearms manufacturers and sellers to market their firearms legally and responsibly, even though no federal laws specifically govern the marketing of firearms, and, although the statement of findings and purposes indicated that Congress sought to immunize the firearms industry from liability for third-party criminal conduct, it did not indicate that the firearms industry should be able to evade responsibility for injuries that result if manufacturers or sellers promote the illegal use of their products.

(ii) the statement of findings and purposes makes clear that Congress sought to preclude only novel civil actions that are based on legal theories without foundation in the common law and that would expand civil liability in a manner never contemplated by Congress or the state legislatures, and, as it is well established that statutes such as CUTPA not only govern the marketing of firearms but also prohibit advertisements that promote or model the unsafe or illegal use of potentially dangerous products, there was no reason to think that the present action represented the sort of civil action that Congress sought to bar.

(iii) although the statement of findings and purposes emphasizes the importance of preserving the rights enshrined in the second

amendment to the United States constitution, it was not clear, in light of prior United States Supreme Court and other federal precedent, that the second amendment's protections extend to assault weapons such as the rifle at issue in the present case.

c. The defendants could not prevail on their claim that construing a statute of general applicability such as CUTPA to be a predicate statute would lead to the absurd result that, if the predicate exception were to encompass every statute that might be capable of being applied to the sale or manufacturing of firearms, then virtually any action seeking to hold firearms manufacturers or sellers liable for third-party gun violence could proceed; the plaintiffs' wrongful marketing claims may proceed without crippling PLCAA, as those claims allege only that one specific family of firearms sellers advertised one particular assault weapon in an uniquely unscrupulous manner, promoting its suitability for illegal, offensive assaults.

d. Extrinsic indicia of congressional intent also supported the conclusion that CUTPA, as applied to the plaintiffs' claims, qualified as a predicate statute under PLCAA:

(i) applying the canon of statutory construction that a federal law is not to be construed to have superseded the historic police powers of the states unless that was the clearly expressed and manifest purpose of Congress, and observing that the regulation of advertising that threatens the public health, safety and morals has long been considered a core exercise of the states' police powers, this court concluded that, because there was no indication in the statutory text or statement of findings and purposes of PLCAA that Congress intended to restrict the power of the states to regulate wrongful advertising, particularly advertising that encourages consumers to engage in egregious criminal conduct, it could not find that the plaintiffs' wrongful marketing claims under CUTPA were precluded by PLCAA.

(ii) the defendants could not prevail on their claim that the canon of ejusdem generis, which dictates that, when a statute sets forth a general category of persons or things and then enumerates specific examples thereof, and when the scope of the general category is unclear, a rebuttable presumption may arise that the general category encompasses only things similar in nature to the specific examples that follow, resolved in their favor any statutory ambiguity as to whether CUTPA falls within the purview of the predicate exception, as the predicate exception expressly contains two examples of statutes that are applicable to the sale or marketing of firearms, none of which relates to consumer protection or unfair trade practices; the canon of ejusdem generis was inapplicable to the predicate exception in the face of a contrary manifestation of legislative intent, and the most reasonable interpretation of the legislative history surrounding the inclusion of the two examples indicated that they were added to the predicate exception not in an effort to define, clarify, or narrow the universe of laws that qualify as predicate statutes but, rather, simply to stave off the politically potent attack that PLCAA would have barred actions such as one that had arisen from a widely reported sniper attack involving a semiautomatic weapon in the District of Columbia a few years prior to the passage of PLCAA.

(iii) the defendants could not rely on the canon that statutory exceptions, such as the predicate exception, must be construed narrowly to preserve the primary purpose of the entire statutory scheme, as the defendants misperceived the primary purpose of PLCAA, which was not to shield firearms sellers from liability for wrongful or illegal conduct.

(iv) the legislative history of similar federal legislation proposed but not passed in the same year that PLCAA was introduced, which would have bestowed PLCAA-type immunity on fast food restaurant companies to protect them from actions seeking to hold them liable for consumers' obesity and related health problems, and which contained substantially identical language to that set forth in the predicate exception in PLCAA, made clear that the "applicable" statutes for purposes of the predicate exception in the proposed legislation were not limited to laws that directly and specifically regulated the food industry but, rather, encompassed state consumer protection laws, such as CUTPA, even though such provisions constituted laws

of general applicability that did not expressly address food and beverage marketing or labeling.

(v) this court's review of the legislative history of PLCAA led it to conclude that Congress did not intend to limit the scope of the predicate exception to violations of firearms specific laws or to confer immunity from all claims alleging that firearms sellers violated laws governing unfair trade practices, as the sponsor and cosponsors of the proposed legislation that became PLCAA emphasized that their primary concern was not with actions such as the present one, in which individual plaintiffs who have been harmed in a specific incident of gun violence seek to hold the sellers responsible for specific misconduct in selling the weapons involved, but, rather, sought to preclude the rising number of frivolous actions brought by municipalities and anti-gun activists that target the entire firearms industry, and, furthermore, many legislators stated or implied that the only actions that would be barred by PLCAA would be ones in which a firearms manufacturer or seller bore no responsibility or blame for the misuse of its firearms in the commission of a crime or for the plaintiff's injuries, and sought to foreclose only novel legal theories and unprecedented tort theories, unlike the legal theories advanced in the present case, that had been developed by anti-gun activists with the goal of putting firearms sellers out of business.

7. In light of this court's holdings, the trial court's judgment was reversed insofar as it ruled that the plaintiffs lacked standing under CUTPA and insofar as it concluded that the plaintiffs' wrongful death claims predicated on the theory that any sale of military style assault weapons to the civilian market constituted an unfair trade practice were not time barred, the trial court's judgment was affirmed in all other respects, and the case was remanded for further proceedings.

(*Three justices dissenting in part in one opinion*)

Argued November 14, 2017—officially released March 19, 2019

*Procedural History*

Action to recover damages for, inter alia, the wrongful death of the named plaintiff's decedent resulting from the defendants' alleged violation of the Connecticut Unfair Trade Practices Act, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Bellis, J.*, granted the motions of the named defendant et al. to strike the amended complaint and rendered judgment for the named defendant et al., from which the plaintiffs appealed; thereafter, the court, *Bellis, J.*, granted the motion to strike filed by the defendant Riverview Sales, Inc., and rendered judgment thereon, and the plaintiffs filed a separate appeal. *Reversed in part*; *further proceedings*.

*Joshua D. Koskoff*, with whom were *Alinor C. Sterling* and *Katherine Mesner-Hage*, for the appellants (plaintiffs).

*James Vogts*, pro hac vice, and *Christopher Renzulli*, with whom were *Scott M. Harrington* and, on the brief, *Andrew A. Lothson*, pro hac vice, *Scott C. Allan*, *Jonathan P. Whitcomb* and *Peter M. Berry*, for the appellees (defendants).

*Howard Zelbo*, *Evan A. Davis*, pro hac vice, and *Elizabeth Vicens*, pro hac vice, filed a brief for Trinity Church Wall Street as amicus curiae.

*James J. Healy* filed a brief for Nora Freeman Engstrom et al. as amici curiae.

*Matthew H. Geelan, Michael J. Dell*, pro hac vice, and *Rebecca T. Dell*, pro hac vice, filed a brief for Katie Bakes et al. as amici curiae.

*Vaughan Finn* and *Thomas H. Zellerbach*, pro hac vice, filed a brief for The Brady Center To Prevent Gun Violence as amicus curiae.

*John J. Kennedy, Jr., Brendan K. Nelligan, Brad S. Karp*, pro hac vice, *H. Christopher Boehning*, pro hac vice, and *Amy J. Beaux*, pro hac vice, filed a brief for the Law Center To Prevent Gun Violence as amicus curiae.

*George Jepsen*, former attorney general, *Perry Zinn Rowthorn*, former deputy attorney general, *Kimberly Massicotte*, associate attorney general, and *Jeremy Pearlman*, assistant attorney general, filed a brief for the State of Connecticut et al. as amici curiae.

*Daniel J. Klau* filed a brief for CT Against Gun Violence et al. as amici curiae.

*David N. Rosen* and *Alexander Taubes* filed a brief for Newtown Action Alliance et al. as amici curiae.

*Kenneth R. Slater, Jr., David H. Thompson*, pro hac vice, *Peter A. Patterson*, pro hac vice, and *John D. Ohlendorf*, pro hac vice, filed a brief for the Connecticut Citizens Defense League, Inc., as amicus curiae.

*Lawrence G. Keane* and *Victor E. Schwartz*, pro hac vice, filed a brief for the National Shooting Sports Foundation as amicus curiae.

*Robert J. Chomiak* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Kenneth R. Slater, Jr., Paul D. Clement*, pro hac vice, and *Erin E. Murphy*, pro hac vice, filed a brief for the National Rifle Association of America, Inc., as amicus curiae.

*Joseph P. Secola* filed a brief for Gun Owners of America, Inc., et al. as amici curiae.

*Opinion*

## TABLE OF CONTENTS

*Page*

I. PROCEDURAL HISTORY . . . . . . . . . . . . . . . . 66
II. ALLEGED FACTS . . . . . . . . . . . . . . . . . . . . 70
III. NEGLIGENT ENTRUSTMENT . . . . . . . . . . . . . 75
IV. WRONGFUL DEATH AND CUTPA: ISSUES OF
    STATE LAW. . . . . . . . . . . . . . . . . . . . . . . 85
    A. CUTPA Standing . . . . . . . . . . . . . . . . . . 88
    B. Statute of Limitations. . . . . . . . . . . . . . 100
        1. Procedural History . . . . . . . . . . . . . 100
        2. Legal Principles . . . . . . . . . . . . . . . 102
    C. Connecticut Product Liability Act Preemption . 106
    D. CUTPA Personal Injury Damages. . . . . . . . 109
V. WRONGFUL DEATH AND CUTPA: ISSUES OF
    FEDERAL LAW. . . . . . . . . . . . . . . . . . . . . 116
    A. PLCAA Overview . . . . . . . . . . . . . . . . . 116
    B. The Plain Language of the Statute . . . . . . . 118
        1. The Predicate Exception . . . . . . . . . . . 119
        2. The Statutory Framework . . . . . . . . . . . 121
        3. The Statement of Findings and Purposes. . . 130
        4. Absurd Result . . . . . . . . . . . . . . . . . 134
    C. Extrinsic Evidence of Congressional Intent . . . 136
        1. Canons of Statutory Construction. . . . . . . 136
            a. Clear Statement Requirement. . . . . . . . 137
            b. Ejusdem Generis . . . . . . . . . . . . . . . 138
            c. Statutory Exceptions To Be Construed
              Narrowly. . . . . . . . . . . . . . . . . . . 144
        2. Related Legislation . . . . . . . . . . . . . . 144
        3. The Legislative History of PLCAA . . . . . . . 146
VI. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . 156

PALMER, J. On December 14, 2012, twenty year old Adam Lanza forced his way into Sandy Hook Elementary School in Newtown and, during the course of 264 seconds, fatally shot twenty first grade children and six staff members, and wounded two other staff members. Lanza carried out this massacre using a Bushmaster XM15-E2S semiautomatic rifle that was allegedly manufactured, distributed, and ultimately sold to Lanza's mother by the various defendants in this case. There is no doubt that Lanza was directly and primarily responsible for this appalling series of crimes. In this action, however, the plaintiffs—administrators of the estates of nine of the decedents—contend that the defendants also bear some of the blame. The plaintiffs assert a number of different legal theories as to why the defendants should be held partly responsible for the tragedy. The defendants counter that all of the plaintiffs' legal theories are not only barred under Connecticut law, but also precluded by a federal statute, the Protection of Lawful Commerce in Arms Act (PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. §§ 7901 through 7903 (2012), which, with limited exceptions, immunizes firearms manufacturers, distributors,

and dealers from civil liability for crimes committed by third parties using their weapons. See 15 U.S.C. §§ 7902 (a) and 7903 (5) (2012).

For the reasons set forth in this opinion, we agree with the defendants that most of the plaintiffs' claims and legal theories are precluded by established Connecticut law and/or PLCAA. For example, we expressly reject the plaintiffs' theory that, merely by selling semiautomatic rifles—which were legal at the time[1]—to the civilian population, the defendants became responsible for any crimes committed with those weapons.

The plaintiffs have offered one narrow legal theory, however, that is recognized under established Connecticut law. Specifically, they allege that the defendants knowingly marketed, advertised, and promoted the XM15-E2S for civilians to use to carry out offensive, military style combat missions against their perceived enemies. Such use of the XM15-E2S, or any weapon for that matter, would be illegal, and Connecticut law does not permit advertisements that promote or encourage violent, criminal behavior. Following a scrupulous review of the text and legislative history of PLCAA, we also conclude that Congress has not clearly manifested an intent to extinguish the traditional authority of our legislature and our courts to protect the people of Connecticut from the pernicious practices alleged in the present case. The regulation of advertising that threatens the public's health, safety, and morals has long been considered a core exercise of the states' police powers. Accordingly, on the basis of that limited theory, we conclude that the plaintiffs have pleaded allegations sufficient to survive a motion to strike and are entitled to have the opportunity to prove their wrongful marketing allegations. We affirm the trial court's judgment insofar as that court struck the plaintiffs' claims predicated on all other legal theories.

I

PROCEDURAL HISTORY

The plaintiffs brought the present action in 2014, seeking damages and unspecified injunctive relief.[2] The defendants include the Bushmaster defendants (Remington),[3] one or more of which is alleged to have manufactured the Bushmaster XM15-E2S semiautomatic rifle that was used in the crimes; the Camfour defendants,[4] distributors that allegedly purchased the rifle from Remington and resold it to the Riverview defendants; and the Riverview defendants,[5] retailers that allegedly sold the rifle to Adam Lanza's mother, Nancy Lanza, in March, 2010.[6] The gravamen of the plaintiffs' claims, which are brought pursuant to this state's wrongful death statute, General Statutes § 52-555,[7] is that the defendants (1) negligently entrusted to civilian consumers an AR-15 style assault rifle[8] that is suitable for use only by military and law enforcement personnel, and

(2) violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.,[9] through the sale or wrongful marketing of the rifle.

The defendants moved to strike the plaintiffs' complaint, contending that all of the plaintiffs' claims are barred by PLCAA. The defendants also argued that, to the extent that the plaintiffs' claims sound in negligent entrustment, the plaintiffs failed to state a legally valid negligent entrustment claim under Connecticut common law, and, to the extent that their claims are predicated on alleged CUTPA violations, they are legally insufficient because, among other things, (1) the plaintiffs lack standing to bring a CUTPA action, (2) the plaintiffs' claims are time barred by CUTPA's three year statute of limitations; see General Statutes § 42-110g (f); (3) personal injuries and death are not cognizable CUTPA damages, and (4) the plaintiffs' CUTPA claims are simply veiled product liability claims and, therefore, are barred by General Statutes § 52-572n (a), the exclusivity provision of the Connecticut Product Liability Act (Product Liability Act).[10]

In response, the plaintiffs argued that PLCAA does not confer immunity on the defendants for purposes of this case because two statutory exceptions to PLCAA immunity—for claims alleging negligent entrustment (negligent entrustment exception)[11] and for claims alleging a violation of a statute applicable to the sale or marketing of firearms (predicate exception)[12]—apply to their claims. The plaintiffs further argued that, for various reasons, the defendants' state law negligent entrustment and CUTPA arguments were ill founded.

Although the trial court rejected most of the defendants' arguments, the court concluded that (1) the plaintiffs' allegations do not fit within the common-law tort of negligent entrustment, (2) PLCAA bars the plaintiffs' claims insofar as those claims sound in negligent entrustment, and (3) the plaintiffs lack standing to bring wrongful death claims predicated on CUTPA violations because they never entered into a business relationship with the defendants. Accordingly, the court granted in their entirety the defendants' motions to strike the plaintiffs' amended complaint.

On appeal, the plaintiffs challenge each of those conclusions.[13] For their part, the defendants contend, as alternative grounds for affirmance, that the trial court improperly rejected their other CUTPA arguments. We conclude that the majority of the plaintiffs' claims were properly struck insofar as those claims are predicated on the theory that the sale of the XM15-E2S rifle to Lanza's mother or to the civilian market generally constituted either negligent entrustment; see part III of this opinion; or an unfair trade practice. See part IV B of this opinion. We also conclude, however, that the plaintiffs have standing to prosecute their CUTPA claims under Connecticut law. See part IV A of this opinion. We

further conclude that PLCAA does not bar the plaintiffs from proceeding on the single, limited theory that the defendants violated CUTPA by marketing the XM15-E2S to civilians for criminal purposes, and that those wrongful marketing tactics caused or contributed to the Sandy Hook massacre.[14] See part V of this opinion. Accordingly, we affirm in part and reverse in part the judgment of the trial court and remand the case for further proceedings.

## II

## ALLEGED FACTS

Because we are reviewing the judgment of the trial court rendered on a motion to strike, we must assume the truth of the following facts, as alleged by the plaintiffs.[15] Lanza carried out the Sandy Hook massacre using a Bushmaster XM15-E2S rifle. That rifle is Remington's version of the AR-15 assault rifle, which is substantially similar to the standard issue M16 military service rifle used by the United States Army and other nations' armed forces, but fires only in semiautomatic mode.

The AR-15 and M16 are highly lethal weapons that are engineered to deliver maximum carnage with extreme efficiency. Several features make these rifles especially well suited for combat and enable a shooter to inflict unparalleled carnage. Rapid semiautomatic fire "unleashes a torrent of bullets in a matter of seconds." The ability to accommodate large capacity magazines allows for prolonged assaults. Exceptional muzzle velocity makes each hit catastrophic. Indeed, the plaintiffs contend, bullets fired from these rifles travel at such a high velocity that they cause a shockwave to pass through the body upon impact, resulting in catastrophic injuries even in areas remote to the direct wound. Finally, the fact that the AR-15 and M16 are lightweight, air-cooled, gas-operated, and magazine fed, enabling rapid fire with limited recoil, means that their lethality is not dependent on good aim or ideal combat conditions.

These features endow the AR-15 with a lethality that surpasses even that of other semiautomatic weapons. "The net effect is more wounds, of greater severity, in more victims, in less time." That lethality, combined with the ease with which criminals and mentally unstable individuals can acquire an AR-15, has made the rifle the weapon of choice for mass shootings, including school shootings.

The particular weapon at issue in this case was manufactured and sold by the Bushmaster defendants. Sometime prior to March, 2010, the Bushmaster defendants sold the rifle to the Camfour defendants. The Camfour defendants subsequently sold the rifle to the Riverview defendants, who operate a retail gun store located in the town of East Windsor.

In March, 2010, Lanza's mother purchased the rifle from the Riverview defendants. Lanza, who was seven-

teen years old at the time, had expressed a desire to join the elite United States Army Rangers unit. His mother bought the rifle to give to or share with him in order to connect with him. However, when Lanza turned eighteen on April 22, 2010, he did not enlist in the military. Still, he gained unfettered access to a military style assault rifle.

Eight months later, on the morning of December 14, 2012, Lanza retrieved the rifle and ten 30 round magazines. Using a technique taught in the first person shooter video games that he played, he taped several of those magazines together to allow for faster reloading. He then drove to Sandy Hook Elementary School.

Just before 9:30 a.m., Lanza shot his way into the locked school using the XM15-E2S. He immediately shot and killed Mary Joy Sherlach as well as the school's principal. He subsequently shot and wounded two staff members.

Lanza next entered Classroom 8, where he used the rifle to kill two adults and fifteen first grade children, including five of the plaintiffs. Finally, he entered Classroom 10, where he used the rifle to kill two adults and five first grade children, including three of the plaintiffs. Nine children from Classroom 10 were able to escape when Lanza paused to reload with another magazine.

In total, the attack lasted less than four and one-half minutes, during which Lanza fired at least 154 rounds from the XM15-E2S, killing twenty-six and wounding two others.[16]

The plaintiffs filed the present action in 2014 seeking damages and injunctive relief. Each of the counts in the operative first amended complaint is predicated on two distinct theories of liability. First, the plaintiffs contend that the AR-15 is a military grade weapon that is "grossly ill-suited" for legitimate civilian purposes such as self-defense and recreation. They also allege that the AR-15 has become the weapon of choice for mass shootings and, therefore, that the risks associated with selling the weapon to the civilian market far outweigh any potential benefits. The defendants continued to sell the XM15-E2S despite their knowledge of these facts. Therefore, the plaintiffs contend, it was both negligent and an unfair trade practice for each of the defendants to sell the weapon, knowing that it eventually would be purchased by a civilian customer who might share it with other civilian users.

The plaintiffs' second theory of liability is that the defendants advertised and marketed the XM15-E2S in an unethical, oppressive, immoral and unscrupulous manner. They contend that the defendants have sought to grow the AR-15 market by extolling the militaristic and assaultive qualities of their AR-15 rifles and, specifically, the weapon's suitability for offensive combat missions. The plaintiffs argue that the defendants' mili-

taristic marketing reinforces the image of the AR-15 as a combat weapon that is intended to be used for the purposes of waging war and killing human beings. Consistent with that image, the defendants further promoted the XM15-E2S as a combat weapon system by designating in their product catalogues that the rifle comes "standard" with a 30 round magazine which, the plaintiffs allege, differs from how the defendants promote and sell rifles for legal civilian purposes such as hunting and sport shooting.[17]

The plaintiffs further contend that the defendants unethically promoted their assault weapons for offensive, military style missions by publishing advertisements and distributing product catalogs that (1) promote the AR-15 as "the uncompromising choice when you demand a rifle as mission adaptable as you are," (2) depict soldiers moving on patrol through jungles, armed with Bushmaster rifles, (3) feature the slogan "[w]hen you need to perform under pressure, Bushmaster delivers," superimposed over the silhouette of a soldier holding his helmet against the backdrop of an American flag, (4) tout the "military proven performance" of firearms like the XM15-E2S, (5) promote civilian rifles as "the ultimate combat weapons system," (6) invoke the unparalleled destructive power of their AR-15 rifles, (7) claim that the most elite branches of the United States military, including the United States Navy SEALs, the United States Army Green Berets and Army Rangers, and other special forces, have used the AR-15, and (8) depict a close-up of an AR-15 with the following slogan: "Forces of opposition, bow down. You are single-handedly outnumbered."

Finally, with respect to this second, wrongful marketing theory of liability, the plaintiffs contend that the defendants' marketing of the XM15-E2S to civilians for offensive assault missions was a substantial factor in causing the plaintiffs' injuries. Specifically, they contend that Lanza had dreamed as a child of joining the elite Army Rangers unit of the United States Army and was, therefore, especially susceptible to militaristic marketing. They further contend that he selected the XM15-E2S for his assault from among an arsenal that included various less lethal arms—at least three handguns, one shotgun, two bolt action rifles, and three samurai swords—and that he specifically chose the XM15-E2S not only for its functional capabilities, including its assaultive qualities and efficiency in inflicting mass casualties, but also because of its marketed association with the military.[18] Finally, they contend that Lanza was a devoted player of first person shooter games featuring variants of the XM15-E2S and that he employed techniques taught in those games to enhance the lethality of his assault on the school. In other words, the plaintiffs allege that the attack, had it occurred at all, would have been less lethal and the carnage less grievous if Lanza had not been encouraged

by the defendants' marketing campaign to select the XM15-E2S as his weapon of choice and taught by violent video games how to kill with it most efficiently. Additional facts and procedural history will be set forth as necessary.

### III

### NEGLIGENT ENTRUSTMENT

In opposition to the defendants' motions to strike, the plaintiffs argued that their claims were not barred by PLCAA because the claims are predicated on allegations of negligent entrustment and CUTPA violations, both of which satisfy statutory exceptions to PLCAA immunity. In this part of the opinion, we consider whether the trial court correctly concluded that the plaintiffs' claims were legally insufficient to the extent that those claims are predicated on a theory of negligent entrustment. The trial court concluded both that the plaintiffs had not sufficiently pleaded a cause of action in negligent entrustment under Connecticut common law and, in the alternative, that the plaintiffs' allegations did not satisfy PLCAA's statutory definition of negligent entrustment. See 15 U.S.C. § 7903 (5) (B) (2012).[19] The plaintiffs challenge both conclusions on appeal. Because we agree with the trial court that the plaintiffs have not pleaded a legally sufficient cause of action in negligent entrustment under our state's common law, we need not consider whether negligent entrustment claims must meet stricter requirements in order to satisfy the federal statutory exception.

The following additional procedural history is relevant to this issue. In response to the defendants' motions to strike, the plaintiffs argued that their claims are not precluded by PLCAA because each of their claims is predicated in part on a theory of negligent entrustment and PLCAA does not confer immunity on sellers of firearms in actions for negligent entrustment. See 15 U.S.C. § 7903 (5) (A) (ii) (2012).[20] In its decision granting the defendants' motions to strike, the trial court concluded that an action for negligent entrustment will lie only when the supplier of a dangerous instrumentality such as a firearm knows or has reason to know that the *direct entrustee* is likely to use the item unsafely. Because the plaintiffs did not allege that there was any specific reason to believe that the Camfour defendants (as direct entrustees of the Remington defendants), the Riverview defendants (as direct entrustees of the Camfour defendants), or Lanza's mother (as a direct entrustee of the Riverview defendants) was incompetent to operate the XM15-E2S or had a propensity to use the weapon in an unsafe manner, the court granted all of the defendants' motions to strike with respect to the plaintiffs' negligent entrustment theories of liability.

We commence our review of this issue with a brief

discussion of the history of and principles that animate the tort of negligent entrustment. The cause of action for negligent entrustment represents a departure from the general rule that an individual cannot be held liable for the conduct of others. It reflects a legitimate societal concern that a person in possession of a dangerous instrument should bear the responsibility of exercising care when entrusting that instrument to another, given the serious risk to society if items like firearms or automobiles should fall into unfit hands. See J. Fisher, Comment, "So How Do You Hold This Thing Again?: Why the Texas Supreme Court Should Turn the Safety off the Negligent Entrustment of a Firearm Cause of Action," 46 Tex. Tech. L. Rev. 489, 495, 501 (2014). The primary question that we must resolve is whether these principles apply only when the entrustor believes or has specific reason to believe that the *direct entrustee* is likely to use the item unsafely or, rather, whether they also apply when it is reasonably foreseeable that the entrustment ultimately will lead to injurious use, whether by the direct entrustee or by some unknown third party.[21] If the former, then the trial court properly found for the defendants on this issue as a matter of law; if the latter, then the plaintiffs are correct that the plaintiffs' claim presents an issue of fact to be decided by a jury.

Although the idea that it may be wrong to entrust a weapon or other dangerous item to one likely to misuse it is as old as civilization,[22] the common-law tort of negligent entrustment traces its origins to *Dixon* v. *Bell*, 105 Eng. Rep. 1023 (K.B. 1816). See B. Todd, "Negligent Entrustment of Firearms," 6 Hamline L. Rev. 467, 467 and n.1 (1983). In *Dixon*, the defendant sent a preadolescent girl to retrieve a loaded gun, resulting in the accidental shooting of the plaintiff's son. See *Dixon* v. *Bell*, supra, 1023. In upholding a verdict for the plaintiff that the defendant was liable for entrusting the girl with the care and custody of the weapon, the court recognized that "he well [knew] that the said [girl] was too young, and an unfit and improper person to be sent for the gun  . . . ." Id.

American courts began applying the doctrine of negligent entrustment in the 1920s, following the advent of the mass produced automobile; see J. Fisher, supra, 46 Tex. Tech. L. Rev. 493; and Connecticut first recognized the common-law cause of action in *Turner* v. *American District Telegraph & Messenger Co.*, 94 Conn. 707, 110 A. 540 (1920). In that case, the defendant security company entrusted a loaded pistol to an employee who later instigated a fight with and ultimately shot the plaintiff, a customer's night watchman. Id., 708–11 (preliminary statement of facts). This court held that there was insufficient evidence to support a verdict for the plaintiff on his negligent entrustment claim because there was not "even a scintilla of evidence that the defendant had or ought to have had knowledge or even suspicion that

[its employee] possessed any of the traits . . . attributed to him by the plaintiff," including that "he was a reckless person, liable to fall into a passion, and unfit to be [e]ntrusted with a deadly weapon . . . ." Id., 716. "Without this vitally important fact," the court concluded, "the plaintiff's claim falls to the ground . . . ." Id.

Other Connecticut cases decided in the early twentieth century, although not always expressly resolved under the rubric of negligent entrustment, also suggested that a person can be held liable for third-party injuries resulting from another's use of a dangerous item only if the entrustment of that item was made with actual or constructive knowledge that misuse by the entrustee was foreseeable. In *Wood* v. *O'Neil*, 90 Conn. 497, 97 A. 753 (1916), for example, this court held that no cause of action in negligence could be maintained against the parents of a fifteen year old boy who accidentally shot a companion with a shotgun because the parents, in permitting the boy to use the gun, had no specific knowledge that he "was possessed of a marked careless disposition." Id., 500.

Subsequently, in *Greeley* v. *Cunningham*, 116 Conn. 515, 165 A. 678 (1933), we articulated the standards that govern a negligent entrustment action in the context of automobiles, which since has become the primary context in which such claims have arisen. See generally J. Fisher, supra, 46 Tex. Tech. L. Rev. 489. In *Greeley*, the plaintiff alleged that the defendant had been negligent in entrusting his car to an unlicensed driver, who subsequently caused an accident while attempting to pass the plaintiff's vehicle. See *Greeley* v. *Cunningham*, supra, 517–18. "[Although] liability cannot be imposed [on] an owner merely because he [e]ntrusts [his automobile] to another to drive [on] the highways," the court explained, "[i]t is . . . coming to be generally held that the owner may be liable for injury resulting from the operation of an automobile he loans to another when he knows or ought reasonably to know that *the one to whom he [e]ntrusts it* is so incompetent to operate it, by reason of inexperience or other cause, that the owner ought reasonably to anticipate the likelihood that in its operation injury will be done to others." (Emphasis added.) Id., 518. This court proceeded to set forth the elements of a cause of action sounding in negligent entrustment of an automobile: (1) the owner of an automobile entrusts it to another person (2) whom the owner knows or should reasonably know is so incompetent to operate it that injury to others should reasonably be anticipated, and (3) such incompetence results in injury. Id., 520.

Since this court decided *Wood*, *Turner*, and *Greeley*, it never has suggested that a cause of action for negligent entrustment—whether involving a vehicle, a weapon, or some other dangerous item—will lie in the absence

of evidence that the direct entrustee is likely to use the item unsafely. Most jurisdictions that have recognized a cause of action in negligent entrustment likewise require that the actor have actual or constructive knowledge that the specific person to whom a dangerous instrumentality is directly entrusted is unfit to use it properly. See, e.g., J. Fisher, supra, 46 Tex. Tech. L. Rev. 496; B. Todd, supra, 6 Hamline L. Rev. 467; S. Beal, "Saving Negligent Entrustment Claims," Trial, February, 2007, p. 35.

In accordance with the majority view, this also is the rule set forth in the Restatement (Second) of Torts. Section 308 of the Restatement (Second) provides that "[i]t is negligence to permit a third person to use a thing . . . [that] is under the control of the actor, if the actor knows or should know that *such person* intends or is likely to use the thing . . . in such a manner as to create an unreasonable risk of harm to others." (Emphasis added.) 2 Restatement (Second), Torts § 308, p. 100 (1965). Section 390, which further defines the tort of negligent entrustment, provides that "[o]ne who supplies . . . a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others . . . is subject to liability for physical harm resulting to them." 2 id., § 390, p. 314; see also B. Todd, supra, 6 Hamline L. Rev. 467 and n.5. We take it as well established, then, that, in order to prove negligent entrustment, a plaintiff must demonstrate that (1) the defendant has entrusted a potentially dangerous instrumentality to a third person (2) whom the entrustor knows or should know intends or is likely to use the instrumentality in a manner that involves unreasonable risk of physical harm, and (3) such use does in fact cause harm to the entrustee or others.

The rule that a cause of action for negligent entrustment will lie only when the entrustor knows or has reason to know that the direct entrustee is likely to use a dangerous instrumentality in an unsafe manner would bar the plaintiffs' negligent entrustment claims. Specifically, there is no allegation in this case that there was any reason to expect that Lanza's mother was likely to use the rifle in an unsafe manner.[23]

The plaintiffs, recognizing that they cannot prevail under this rule, invite us to adopt a different framework, one "that focuses on the existence of a nexus between the defendant and the dangerous user—rather than the number of steps between them . . . ." In other words, their proposal is that a party alleging negligent entrustment need prove only that it was reasonably foreseeable that, following the initial entrustment of a dangerous instrumentality, that instrumentality ultimately would come into the possession of someone who would use it in an unsafe manner. A jury could

find that standard satisfied in this case, they contend, because (1) Remington allegedly marketed its assault rifles to young men who play violent, first person shooter video games and who, as a class, have a history of using such rifles in real mass shootings, and (2) there is evidence that individuals who legally purchase weapons such as the AR-15 often share the weapons with family members, including young men.

We decline the plaintiffs' invitation to stretch the doctrine of negligent entrustment so far beyond its historical moorings. We recognize that some of our sister state courts have permitted negligent entrustment actions to proceed when, although there was no indication that the direct entrustee was incompetent to use a dangerous item, there was reason to believe that the entrustee would in turn share the item with a *specific* third party who would misuse it. This has been the case, for example, when a parent or other agent purchased a weapon or vehicle for a child who was present at the place and time of sale.[24] We need not decide whether and to what extent Connecticut would recognize a cause of action for negligent entrustment under such circumstances, however, because, in the present case, the plaintiffs do not allege that any of the defendants possessed any knowledge or had any specific reason to believe either that Lanza's mother would share the XM15-E2S with her son or that he was especially likely to operate it unsafely or illegally. In any event, the plaintiffs have failed to cite to a single case, from any jurisdiction, that allowed an action for negligent entrustment to proceed when the nexus between a manufacturer of a product and the person who ultimately used that product in an unsafe manner was as attenuated as it is in the present case.[25]

We also recognize that there is authority for the proposition that entrustment may be deemed negligent when the entrustor has no specific knowledge regarding the entrustee's personal competence or character but knows that the entrustee is a member of a class that is notoriously unfit to safely utilize the entrusted item. See 2 Restatement (Second), supra, § 308, comment (b), p. 100. The plaintiffs argue that we should apply that principle in this case because (1) gun buyers as a class are known to sometimes share their weapons with family members, including young males, and (2) young males, in turn, are known to sometimes use assault weapons to commit mass shootings. Once again, we decline the invitation to so dramatically expand the scope of negligent entrustment liability.

As we noted, the tort of negligent entrustment saw its florescence, if not its modern genesis, in the advent of the mass produced automobile. See B. Todd, supra, 6 Hamline L. Rev. 467; A. Cholodofsky, Note, "Torts: Does the Negligent Entrustment Doctrine Apply to Sellers?" 39 U. Fla. L. Rev. 925, 928 (1987). In some

instances, a person may be unsuited to drive an automobile because he is reckless, or inebriated, or otherwise distinctly unfit to drive safely on the public roads. See A. Cholodofsky, supra, 926 and nn. 5–6. It also is a matter of common sense and common knowledge, however, that certain classes of people—e.g., young children and blind persons—are inherently unfit to drive. Our laws recognize as much. See General Statutes § 14-36 (c) and (e) (establishing, among other things, age and vision screening requirements for motor vehicle operator's permit or license). Accordingly, one may be negligent for entrusting an automobile to such users even in the absence of any particular knowledge about their individual driving skills, experience, or temperament. A jury reasonably might conclude that the same is true with respect to firearms and other weapons and dangerous equipment. See B. Todd, supra, 468–69.

The plaintiffs' theory, however, is fundamentally different. They do not contend that all gun buyers such as Lanza's mother, or young men such as Lanza, are incapable of safely operating an AR-15. The plaintiffs do not even contend that such users usually or even frequently operate such weapons unsafely or unlawfully. Rather, the plaintiffs contend that it is objectively unreasonable to legally sell an assault weapon to an adult buyer, for no other reason than that some small subset of buyers will share weapons with their young adult sons and some much smaller subset of young adult males will use those weapons to commit terrible, random crimes. The only plausible way to construe that claim—and we do not understand the plaintiffs to deny this—is that any commercial sale of assault weapons to civilian users constitutes negligent entrustment because the social costs of such sales outweigh the perceived benefits. Other courts have rejected such a theory, as do we. See, e.g., *McCarthy* v. *Sturm, Ruger & Co.*, 916 F. Supp. 366, 370 (S.D.N.Y. 1996), aff'd sub nom. *McCarthy* v. *Olin Corp.*, 119 F.3d 148 (2d Cir. 1997); *Merrill* v. *Navegar, Inc.*, 26 Cal. 4th 465, 483–84, 28 P.3d 116, 110 Cal. Rptr. 2d 370 (2001); see also *Phillips* v. *Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1226 (D. Colo. 2015) (rejecting theory that unmediated online sales of hazardous items represent negligent entrustment), appeal dismissed, United States Circuit Court of Appeals, Docket No. 15-1153 (10th Cir. July 21, 2015). Accordingly, the plaintiffs' action cannot proceed under the negligent entrustment exception to immunity under PLCAA.

IV

WRONGFUL DEATH AND CUTPA:
ISSUES OF STATE LAW

We turn next to the question of whether the trial court properly granted the defendants' motion to strike the plaintiffs' wrongful death claims insofar as those claims are predicated on alleged CUTPA violations.

Because we have concluded that the plaintiffs have not pleaded a legally sufficient negligent entrustment claim under Connecticut common law, PLCAA will bar the present action unless (1) the plaintiffs have pleaded a cognizable CUTPA violation, and (2) CUTPA constitutes a predicate statute for purposes of 15 U.S.C. § 7903 (5) (A) (iii).

In their motions to strike, the defendants argued, among other things, that (1) the plaintiffs' claims were barred by CUTPA's three year statute of limitations, (2) damages for personal injuries and death resulting therefrom are not cognizable under CUTPA, (3) the plaintiffs' CUTPA claims are precluded by the Product Liability Act; see General Statutes § 52-572n (a); and (4) CUTPA is not a valid predicate statute for purposes of PLCAA. The trial court rejected each of these arguments. The court agreed with the defendants, however, that CUTPA does not afford protection to persons who do not have a consumer or other commercial relationship with the alleged wrongdoer. Accordingly, the court concluded that the plaintiffs lacked standing to pursue wrongful death claims predicated on CUTPA violations.

On appeal, the plaintiffs contend that the trial court improperly struck their claims for lack of standing to pursue them under CUTPA. For their part, the defendants claim that the trial court's judgment can be affirmed on the alternative ground that the court's other determinations were improper.

As an initial matter, we reiterate that the plaintiffs' CUTPA based wrongful death claims are predicated on at least two fundamentally distinct theories of liability. First, the plaintiffs contend that the defendants violated CUTPA by selling the XM15-E2S to the civilian market despite their knowledge that there is no legitimate civilian use for such a weapon, that assault weapons such as the AR-15 pose unreasonable risks when used by civilians, and that individuals unfit to operate such weapons likely would gain access to them. In other words, the plaintiffs allege, in essence, that any sale of any assault weapon to any civilian purchaser in Connecticut is, ipso facto, an unfair trade practice under CUTPA.

Second, the plaintiffs contend that the defendants violated CUTPA by advertising and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle. Specifically, they allege that the defendants:

- promoted use of the XM15-E2S for offensive, assaultive purposes—specifically, for "waging war and killing human beings"—and not solely for self-defense, hunting, target practice, collection, or other legitimate civilian firearm uses

- extolled the militaristic qualities of the XM15-E2S

- advertised the XM15-E2S as a weapon that allows a single individual to force his multiple opponents to "bow down"

- marketed and promoted the sale of the XM15-E2S with the expectation and intent that it would be transferred to family members and other unscreened, unsafe users after its purchase.

The plaintiffs further allege in this regard that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre.

For the reasons that follow, we conclude that the trial court improperly granted the defendants' motion to strike these allegations in their entirety. We agree with the plaintiffs that the trial court improperly concluded that they lack standing to pursue any of their CUTPA claims against the defendants. With respect to the plaintiffs' first theory of CUTPA liability—that the sale of AR-15s to the civilian population is ipso facto unfair—we agree with the defendants that the trial court's judgment can be affirmed on the alternative ground that the plaintiffs' claim is time barred under the CUTPA statute of limitations. Cf. footnote 14 of this opinion. However, with respect to the plaintiffs' second theory of liability—that the defendants' wrongful marketing of the XM15-E2S for illegal, offensive purposes was a causal factor in increasing the casualties of the Sandy Hook massacre—we find the defendants' various alternative bases for affirmance unpersuasive.

A

CUTPA Standing

Although the plaintiffs brought their claims pursuant to the wrongful death statute; General Statutes § 52-555; a wrongful death action will lie only when the deceased person could have brought a valid claim for the injuries that resulted in death if he or she had survived. See part IV B of this opinion. Accordingly, to survive a motion to strike, the plaintiffs must be able to establish that they have standing to pursue a CUTPA claim for their injuries. We first consider whether the trial court properly concluded that the plaintiffs lacked standing to bring the present action under CUTPA because they were third-party victims who did not have a direct consumer, commercial, or competitor relationship (business relationship or privity requirement) with the defendants. Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors,

or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant. Accordingly, we agree with the plaintiffs that the trial court improperly struck their CUTPA based wrongful death claims.

Whether one must have entered into a consumer or commercial relationship with an alleged wrongdoer in order to have standing to bring a CUTPA action presents a question of statutory interpretation. The plain meaning of the statutory text must be our lodestar. See General Statutes § 1-2z.

General Statutes § 42-110g (a) creates a private right of action for persons injured by unfair trade practices and provides in relevant part: "*Any person* who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . ." (Emphasis added.) On its face, the statute plainly and unambiguously authorizes *anyone* who has suffered an ascertainable financial loss as a result of an unfair trade practice to bring a CUTPA action. Nothing in the text of the statute indicates that the right afforded by § 42-110g (a) is enjoyed only by persons who have done business of some sort with a defendant.

Even if we were to conclude that the statute is ambiguous in this regard, we perceive nothing in the legislative history or purpose of the statute that would support the defendants' theory that something more than an ascertainable financial loss caused by a prohibited act is necessary to confer standing under CUTPA. When CUTPA originally was enacted in 1973, the statute authorized private actions for "[a]ny person who *purchases or leases goods or services from a seller or lessor primarily for personal, family or household purposes and thereby* suffers any ascertainable loss of money or property, real or personal, as a result . . . ." (Emphasis added.) Public Acts 1973, No. 73-615, § 7 (P.A. 73-615), codified as amended at General Statutes (Rev. to 1975) § 42-110g (a). It is clear, then, that a direct consumer relationship initially was required in order to bring a CUTPA action.

Over the following decade, however, a series of amendments eliminated that privity requirement. Of particular note are the 1975 and 1979 amendments. In 1975, the legislature amended the statute to confer standing on two distinct classes of plaintiffs. See Public Acts 1975, No. 75-618, § 5 (P.A. 75-618). As amended, the statute provided that CUTPA actions can be brought either by "any person who purchases or leases goods or services from a seller or lessor primarily for personal, family or household purposes and thereby suffers any ascertainable loss . . . as a result" or by "[a]ny person

who suffers any ascertainable loss of money or property, real or personal, as a result [of a prohibited practice] . . . ." P.A. 75-618, § 5, codified as amended at General Statutes (Rev. to 1977) § 42-110g (a). In other words, the legislature conferred standing on an additional category of plaintiffs, namely, those whose injuries were not the result of a direct consumer purchase or lease of goods or services. Presumably recognizing that the original category of CUTPA plaintiffs (consumer direct purchasers and lessors) had become redundant insofar as it was merely a subset of the new, broader category that had been added in the 1975 amendments—i.e., any person who suffers an injury as a result of a prohibited practice—the legislature amended the statute again in 1979 to eliminate the reference to direct purchasers. See Public Acts 1979, No. 79-210, § 1, codified at General Statutes (Rev. to 1981) § 42-110g (a). As we previously have explained; see *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 86–87 and n.30, 793 A.2d 1048 (2002); it is clear from this history that, although a business relationship initially was required to bring a CUTPA action, the legislature chose to eliminate that privity requirement and instead conferred standing on any person who could establish an ascertainable loss as a result of an unfair trade practice.

This conclusion finds additional support in the legislative proceedings pertaining to the various 1970s amendments. From the start, CUTPA prohibited unfair trade practices associated not only with the actual sale and distribution of products and services, but also with the advertising and offering of those products and services for sale.[26] However, when the House of Representatives debated Substitute House Bill No. 5613, the bill that ultimately became No. 78-346 of the 1978 Public Acts, several representatives expressed concerns that the original file copy of that bill might be understood to mean that unfair advertising would no longer constitute a prohibited trade practice. In explaining the need to amend the bill, Representative Raymond C. Ferrari cautioned that CUTPA should not be watered down so as to "require the actual sale of an item as opposed to simply allow[ing] the enforcement under an advertisement . . . ." 21 H.R. Proc., Pt. 10, 1978 Sess., p. 3987. Representative Robert F. Frankel expressed similar sentiments. See 21 H.R. Proc., Pt. 11, 1978 Sess., p. 4319 ("we would actually be rolling back some of the coverage of [CUTPA] wherein we would be requiring a sale of advertised products before the Commissioner [of Consumer Protection] could become involved"). The fact that the legislature sought to ensure that advertising alone—even advertising that never results in a sale—could constitute a prohibited practice suggests that an actual business relationship was not deemed to be a precondition for a CUTPA action following the 1975 amendments.

It is true that the primary concern of those representa-

tives during the 1978 hearings was to prevent the Department of Consumer Protection (department) from being stripped of its authority to aggressively enforce CUTPA violations relating to false or misleading advertising. It is, of course, possible that the legislature wanted the department to be able to curtail wrongful advertising campaigns at their inception, without having to wait until consumers were harmed before taking legal action, but intended that private individuals not have standing to sue unless and until they had purchased goods or services in reliance on such advertisements. It bears emphasis, however, that the legislative history of CUTPA is replete not only with references to the broad scope and remedial nature of the act[27] but also with statements specifically indicating a legislative awareness that the department and the Office of the Attorney General were not equipped to prosecute every unfair trade practice and a concomitant belief that it was important to incentivize broad enforcement action by private litigants.[28] See, e.g., *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615 and nn. 4–5, 618, 440 A.2d 810 (1981).

More directly on point is the testimony of Assistant Attorney General Arnold Feigen, which was offered on behalf of Attorney General Carl Ajello and Commissioner of Consumer Protection Mary Heslin, before the General Law Committee. See Conn. Joint Standing Committee Hearings, General Law, Pt. 4, 1979 Sess., p. 1159. Testifying in favor of the 1979 amendment that eliminated the direct purchaser requirement language, Feigen explained that "[n]umerous arguments have been raised in both state and federal courts that [a] plaintiff, in order to sue, must be a purchaser or a lessee of a seller . . . ." Id. "The amendment," he opined, "will now allow a suit by any person who suffers any ascertainable loss of money or property." Id. Those statements, although not dispositive of the question before us, provide support for the plaintiffs' theory that the legislature intended to eliminate the business relationship requirement when it amended CUTPA. See *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 86–87 and n.30.

The defendants, while implicitly acknowledging that the plain language of § 42-110g (a) no longer imposes a business relationship requirement, offer two arguments as to why we should continue to read such a requirement into the statute. First, they contend that the trial court properly concluded that our prior cases and those of the Appellate Court have recognized a business relationship requirement and that principles of stare decisis and legislative acquiescence counsel against departing from those decisions. Second, the defendants contend that prudential concerns support limiting CUTPA standing to persons who have a direct business relationship with the alleged wrongdoer. We consider each argument in turn.

In support of its conclusion that our cases impose a business relationship requirement, the trial court relied on this court's decisions in *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 59, and *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). Neither decision compels such a result.

In *Vacco*, we recognized that the legislature, by " 'deleting all references to "purchasers, sellers, lessors, or lessees" ' " in § 42-110g (a) in 1979, had eliminated CUTPA's privity requirement. *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 88. We proceeded to clarify, however, that the elimination of the privity requirement did not mean that *anyone* could bring a CUTPA action, no matter how attenuated the connection between his or her injuries and a defendant's allegedly unfair trade practices. "Notwithstanding the elimination of the privity requirement," we explained, "it strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any ascertainable harm, caused by any person in the conduct of any trade or commerce." (Internal quotation marks omitted.) Id. We further observed, however, that CUTPA liability could reasonably be cabined in the same manner as with common-law tort actions: "[N]otwithstanding the broad language and remedial purpose of CUTPA, we have applied traditional common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA." (Footnote omitted.) Id. Notably, we cited *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98 (2001), as an example of a case in which the alleged harms suffered by the plaintiffs—the city of Bridgeport and its mayor—as a result of gun violence were "too remote and derivative" with respect to the challenged conduct for the plaintiffs to have standing to bring a CUTPA claim. *Vacco* v. *Microsoft Corp.*, supra, 88–89, citing *Ganim* v. *Smith & Wesson Corp.*, supra, 344, 365. We proceeded in *Vacco* to apply the same three part remoteness analysis that we had applied in *Ganim*, ultimately concluding that the plaintiff lacked standing because his injuries were too remote in relation to the defendant's allegedly anticompetitive conduct. *Vacco* v. *Microsoft Corp.*, supra, 90–92; see *Ganim* v. *Smith & Wesson Corp.*, supra, 353. Accordingly, *Vacco* stands for the proposition that standing to bring a CUTPA claim will lie only when the purportedly unfair trade practice is alleged to have directly and proximately caused the plaintiff's injuries. This remoteness requirement serves the same function as a privity requirement, as it mitigates any concerns associated with imposing limitless liability on CUTPA defendants.

Although our decision in *Ventres* could be read to suggest that the plaintiff must have a business relationship with the defendant, a closer review indicates that

it does not stand for this sweeping proposition. In that case, a land trust and a conservancy (property owners) alleged that the named defendant, Goodspeed Airport, LLC, among other defendants, had violated CUTPA by trespassing on the property owners' land. See *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. 109, 112. We concluded, as a matter of law, that, even if the property owners had been able to prove their allegations, none of the alleged conduct would have risen to the level of a CUTPA violation. See id., 156–58.

As an alternative, independent basis for upholding the trial court's decision to strike the property owners' CUTPA claims, we briefly considered the property owners' contention that a CUTPA plaintiff is not required to allege any business relationship with a defendant, summarily rejecting that claim on the ground that the property owners had provided no authority for the proposition. Id., 157–58. Significantly, in contrast to the present case, *Ventres* did not involve allegations that a business relationship between the defendants and a third party had resulted in the harm alleged. Therefore, we had no occasion to discuss or apply the proximate cause analysis set forth in *Vacco*. See *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 90–92. In other words, there was no business relationship that could result in any causal connection to the injury alleged.

Accordingly, the court in *Ventres* did not hold that every CUTPA claim requires a business relationship between a plaintiff and a defendant. Indeed, we did not analyze that issue, and at no point did we examine either the text or the legislative history of the statute, both of which, as we previously explained, strongly suggest that the legislature did not intend to impose a privity requirement. We thus conclude that the principles of stare decisis and legislative acquiescence do not preclude us from construing § 42-110g (a) de novo in the present case to address this question. See *Igartua* v. *Obama*, 842 F.3d 149, 160 (1st Cir. 2016) (Torruella, J., concurring in part and dissenting in part) ("[c]onsidering the cursory treatment given to this issue by the . . . panel [in the prior decision], our hands are not tied by stare decisis"), cert. denied sub nom. *Igartua* v. *Trump*,     U.S.     , 138 S. Ct. 2649, 201 L. Ed. 2d 1050 (2018).

Next, we consider the defendants' argument that this court has, for prudential reasons, set various limitations on the types of parties that may bring CUTPA claims. The defendants contend that similar policy rationales counsel in favor of imposing a business relationship requirement. In two of the cases that the defendants cite in support of this proposition, however, this court concluded that CUTPA simply did not govern the conduct at issue, and, therefore, we did not consider the question of standing. See *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997) (medical

malpractice claims are not subject to CUTPA); *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 180, 510 A.2d 972 (1986) (CUTPA does not apply to deceptive practices in purchase and sale of securities). In the third case on which the defendants rely, namely, *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 627 A.2d 374 (1993), this court concluded that third parties lacked CUTPA standing only in the context of the unique professional relationship between attorneys and their clients. See id., 729. Accordingly, the cases that the defendants cite, which address unique professional service contexts and relationships, provide little support for the general proposition that CUTPA does not confer standing outside the limited confines of a business relationship between the CUTPA plaintiff and defendant.

We need not decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA action. What is clear is that none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case. "Standing . . . is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticable interests and that judicial decisions [that] may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Slimp* v. *Dept. of Liquor Control*, 239 Conn. 599, 609, 687 A.2d 123 (1996). As we explained in *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 313, there are several reasons why standing traditionally has been restricted to those parties directly injured by a defendant's conduct: "First, the more indirect an injury is, the more difficult it becomes to determine the amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary [when] there are directly injured parties who can remedy the harm without these attendant problems." (Internal quotation marks omitted.) Id., 353.

*Ganim*, in fact, provides an instructive contrast to the present case. In *Ganim*, the mayor and the city of Bridgeport brought an action against handgun manufacturers, trade associations, and retail gun sellers to recoup various municipal costs associated with gun violence, including increased police and emergency services, loss of investment, and victimization of Bridgeport's citizens. Id., 315–16, 326–27. We concluded that

the municipal plaintiffs lacked standing under CUTPA because the "harms claimed . . . [were too] indirect, remote and derivative with respect to the defendants' conduct . . . ." Id., 353. Moreover, we observed that one easily could identify several sets of potential plaintiffs who were more directly harmed by the defendants' alleged misconduct than was the city: "[A]ll [of] the homeowners in Bridgeport who have been deceived by the defendants' misleading advertising, all of the persons who have been assaulted or killed by the misuse of the handguns, and all of the families of the persons who committed suicide using those handguns." Id., 359.

In the present case, by contrast, the plaintiffs allege that the defendants' wrongful advertising magnified the lethality of the Sandy Hook massacre by inspiring Lanza or causing him to select a more efficiently deadly weapon for his attack. Proving such a causal link at trial may prove to be a Herculean task.[29] But if it can be proven—and the posture in which this case reaches us requires that we assume it can[30]—the link between the allegedly wrongful conduct and the plaintiffs' injuries would be far more direct and less attenuated than in *Ganim*.

More fundamentally, in this case, unlike in *Ganim*, it is the direct victims of gun violence who are challenging the defendants' conduct; no private party is better situated than the plaintiffs to bring the action. A claim that a defendant's advertisements unethically promote illegal conduct is fundamentally different from one alleging false or misleading advertising. The primary harm associated with the latter is that a consumer will rely to his or her detriment on the advertiser's representations; it is in the misinformed purchase of the product or service that the wrong becomes fully manifest. Actual customers, then, typically will be the parties most directly and adversely impacted by the alleged wrong.

The gravamen of a wrongful advertising claim, by contrast, is that an advertisement models or encourages illegal or unsafe behavior. In such instances, the immediate victims are just as likely to be third parties who are not customers, whether it be individuals who engage in inappropriate conduct inspired by the advertisements or the direct victims of that conduct. For example, when an especially racy sports car commercial disclaims, "professional driver, closed course, do not attempt this at home," the perceived risk is not merely—or even primarily—that viewers will purchase that particular vehicle and drive it unsafely as a result of the commercial. Of at least equal concern is the possibility that noncustomer viewers will emulate the commercial when driving their own vehicles, violating motor vehicle laws, and possibly causing injury to themselves or others, including passengers or pedestrians.

In the present case, the wrong charged is that the defendants promoted the use of their civilian assault

rifles for offensive, military style attack missions. The most directly foreseeable harm associated with such advertising is that innocent third parties could be shot as a result. The decedents are the ones who got shot.

If the defendants' marketing materials did in fact inspire or intensify the massacre, then there are no more direct victims than these plaintiffs; nor is there any customer of the defendants with a better claim to standing. That is to say, if these plaintiffs cannot test the legality of the defendants' advertisements pursuant to § 42-110g, then no one can. For these reasons, we conclude that the trial court improperly determined that the plaintiffs lack standing to assert wrongful death claims predicated on the defendants' alleged CUTPA violations.

B

Statute of Limitations

Having concluded that the plaintiffs have standing to bring the present action, we must turn our attention to whether the judgment of the trial court dismissing the plaintiffs' action may be affirmed on an alternative ground. Although its determination that the plaintiffs lacked standing to bring wrongful death claims predicated on alleged CUTPA violations disposed of the case before it, the trial court considered, in the interest of completeness, the defendants' arguments regarding the legal sufficiency of the plaintiffs' CUTPA claims. We first consider the defendants' argument that the plaintiffs' claims are time barred because they did not comply with CUTPA's three year statute of limitations.

1

Procedural History

The following additional procedural history is relevant to this claim. The complaint alleges that Lanza's mother purchased the rifle in question in March, 2010, and that it was manufactured and distributed sometime prior to that date. Lanza carried out the Sandy Hook massacre on December 14, 2012, on which date all of the decedents died. The plaintiffs delivered their summons and complaint to a state marshal on December 13, 2014.

The defendants moved to strike the plaintiffs' wrongful death claims on the theory that those claims are predicated on underlying CUTPA violations and that private actions brought pursuant to CUTPA are subject to a three year statute of limitations. See General Statutes § 42-110g (f).[31] They argued that, because all of the relevant transfers of the rifle occurred no later than March, 2010, and because the present action was not initiated until more than four years later, in December, 2014, the plaintiffs' CUTPA claims are time barred.

The trial court, like the defendants, proceeded on the theory that the date of the alleged CUTPA violations was, at the very latest, March, 2010, when the Riverview

defendants sold the rifle to Lanza's mother. The court was not persuaded, however, that CUTPA is the controlling statute of limitations for purposes of the present action. Rather, the court emphasized that, although the plaintiffs' claims were predicated on a theory of liability sounding in unfair trade practices, those claims were *brought* pursuant to § 52-555, the wrongful death statute. That statute has its own statute of limitations, which requires that a wrongful death action "be brought . . . within two years from the date of death," and its own statute of repose, which requires that a wrongful death action "be brought [no] more than five years from the date of the act or omission complained of." General Statutes § 52-555 (a). Because process was served within two years of the date of the decedents' deaths and within five years of the date on which the rifle was sold, the court concluded that the action would not be time barred if the statute of limitations contained in § 52-555 (a) controls.

The trial court therefore sought to resolve the apparent conflict between the statutes of limitations contained in §§ 42-110g (f) and 52-555 (a). Relying on the decision of the Appellate Court in *Pellecchia* v. *Connecticut Light & Power Co.*, 139 Conn. App. 88, 90, 54 A.3d 658 (2012) (adopting trial court's memorandum of decision in *Pellecchia* v. *Connecticut Light & Power Co.*, 52 Conn. Supp. 435, 54 A.3d 1080 [2011]), cert. denied, 307 Conn. 950, 60 A.3d 740 (2013), the trial court concluded that, when a wrongful death claim is predicated on an underlying theory of liability that is subject to its own statute of limitations, it is the wrongful death statute of limitations that controls. Because the court concluded that the CUTPA statute of limitations did not apply, and because the action was brought within two years of the decedents' deaths and within five years of the initial sale of the rifle, the court also concluded that the plaintiffs' wrongful death claims were timely. Accordingly, the court did not have reason to consider whether the plaintiffs' claims predicated on a wrongful advertising theory of liability, which could be premised on conduct postdating the sale of the rifle, were timely.

2

Legal Principles

Turning to the governing legal principles, we first consider whether the trial court correctly determined that, when a wrongful death claim is predicated on an underlying theory of liability that is subject to its own statute of limitations, the plaintiffs need only satisfy the statute of limitations contained in § 52-555 (a). The trial court was correct that, in the ordinary case, § 52-555 (a) supplies the controlling statute of limitations regardless of the underlying theory of liability. This court applied that rule in *Giambozi* v. *Peters*, 127 Conn. 380, 16 A.2d 833 (1940), overruled in part on other grounds by *Foran* v. *Carangelo*, 153 Conn. 356, 216 A.2d

638 (1966), in which the court held that the statute of limitations of the predecessor wrongful death statute, rather than the limitations provision applicable to medical malpractice claims, governed in a wrongful death action based on malpractice. Id., 385; see also *Ecker* v. *West Hartford*, 205 Conn. 219, 245, 530 A.2d 1056 (1987) (suggesting that statute of limitations contained in § 52-555 may control in wrongful death actions predicated on contract and warranty theories of liability). The legislative history of the 1991 amendments to the wrongful death statute reflecting the current statutory language; Public Acts 1991, No. 91-238, § 1; makes clear that *Giambozi* continues to accurately reflect the intent of the legislature in this respect. See 34 H.R. Proc., Pt. 14, 1991 Sess., pp. 5170–72, remarks of Representative Michael P. Lawlor (expressing view that there would be cases in which plaintiffs would be able to maintain wrongful death action under 1991 amendment to § 52-555 even though statute of limitations applicable to underlying medical malpractice would have run).

As the defendants emphasize, however, it is well established that different rules apply to statutes, such as CUTPA, that create a right of action that did not exist at common law. See *Greco* v. *United Technologies Corp.*, 277 Conn. 337, 345 n.12, 890 A.2d 1269 (2006). For such statutes, we have said that the limitations provision "embodies an essential element of the cause of action created—a condition attached to the right to sue at all. The liability and the remedy are created by the same statutes, and the limitations of the remedy are, therefore, to be treated as limitations of the right. . . . It follows that the statutory provision or provisions prescribing the limitation must be strictly observed if liability is to attach to the claimed offender. Failure to show such observance results in a failure to show the existence of a good cause of action." (Internal quotation marks omitted.) *Blakely* v. *Danbury Hospital*, 323 Conn. 741, 748–49, 150 A.3d 1109 (2016); see also id., 749 (time limitation is "essential and integral" to existence of cause of action); *Avon Meadow Condominium Assn., Inc.* v. *Bank of Boston Connecticut*, 50 Conn. App. 688, 699–700, 719 A.2d 66 (time limitation that is contained within statute that creates right of action that did not exist at common law is limitation of liability itself, and, accordingly, CUTPA statute of limitations is jurisdictional), cert. denied, 247 Conn. 946, 723 A.2d 320 (1998), and cert. denied, 247 Conn. 946, 723 A.2d 320 (1998).

The plaintiffs respond that, regardless of whether the statute of limitations contained in § 42-110g (f) amounts to an essential element of a CUTPA cause of action, it need not be satisfied in the present case because this is not a CUTPA action. Rather, their claims are wrongful death claims, for which CUTPA merely provides the underlying theory of wrongfulness.

That argument, although perhaps facially attractive, is precluded by a long line of cases holding that Connecticut's wrongful death statute does not create a new cause of action, independent of any claims that the decedent might have had during his or her life. Rather, the wrongful death statute merely allows the administrator of an estate to append to an already valid claim an additional element of damages consisting of costs associated with the decedent's death. See, e.g., *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 149, 491 A.2d 389 (1985); *Foran* v. *Carangelo*, supra, 153 Conn. 360; *Shaker* v. *Shaker*, 129 Conn. 518, 520–21, 29 A.2d 765 (1942); see also *Kling* v. *Torello*, 87 Conn. 301, 305–306, 87 A. 987 (1913). A necessary consequence of this principle is that a cause of action for wrongful death predicated on a CUTPA violation will lie only insofar as the decedent, had he or she survived, could have satisfied all of the essential elements of the CUTPA claim. See, e.g., *Roque* v. *United States*, 676 F. Supp. 2d 36, 42 (D. Conn. 2009) (plaintiff must prove elements of negligence claim in wrongful death action predicated on negligence); *Nolan* v. *Morelli*, 154 Conn. 432, 435, 226 A.2d 383 (1967) (plaintiff must establish that decedent could recover damages under Dram Shop Act in wrongful death action predicated on that statute); see also *Schwarder* v. *United States*, 974 F.2d 1118, 1129 (9th Cir. 1992) (Alarcon, J., concurring in part and dissenting in part) ("[a] majority of the state courts that have considered the question have held that a survivor cannot bring a wrongful death action if the decedent was barred from [bringing a claim for his injuries] in his lifetime, because the wrongful death claim is essentially derivative of the injury to the decedent"); W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 127, p. 955 ("[t]he wrongful death action for the benefit of survivors is, like other actions based on injuries to others, derivative in nature, arising out of and dependent [on] the wrong done to the injured person and thus barred when his claim would be barred" [footnote omitted]). It is clear, then, that the plaintiffs' wrongful death claims must comply not only with the statute of limitations that governs wrongful death actions but also with CUTPA's statute of limitations. Accordingly, because it is undisputed that the manufacture, distribution, and final sale of the rifle to Lanza's mother all occurred at least three years prior to the commencement of the present action, we conclude that the trial court should have struck as time barred the plaintiffs' wrongful death claims predicated on a theory that any sale to the civilian market of military style assault weapons such as the AR-15 represents an unfair trade practice. Cf. footnote 14 of this opinion.

That determination, however, is not fatal to all of the plaintiffs' claims. As we discussed, the plaintiffs also pleaded, in the alternative, that the defendants violated CUTPA by advertising and marketing the XM15-E2S in

an unethical, oppressive, immoral, and unscrupulous manner. Although the complaint does not specifically allege on what dates or over what period of time such marketing activities occurred, most of the plaintiffs' wrongful marketing claims are phrased in the present tense and, therefore, may be understood to allege that those activities continued through the time the complaint was filed. In addition, the plaintiffs' allegation that Lanza selected the XM15-E2S on the morning of the assault "because of its marketed association with the military" reasonably could be interpreted to mean that such marketing schemes remained in place at the time of the massacre, during the limitation period. Accordingly, because we are compelled to construe the complaint liberally, in the manner most favorable to sustaining its legal sufficiency, we conclude that, for present purposes, the plaintiffs' wrongful advertising theory is not barred by CUTPA's statute of limitations.[32]

C

Connecticut Product Liability Act Preemption

We next consider whether the trial court correctly determined that § 52-572n (a), the exclusivity provision of the Product Liability Act, does not bar the plaintiffs' CUTPA claims. Section 52-572n (a) provides that "[a] product liability claim as provided in [the Product Liability Act] may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." The defendants contend that all of the plaintiffs' CUTPA claims ultimately boil down to the argument that the XM15-E2S is unreasonably dangerous for sale to the civilian market and, therefore, that manufacturers and distributors of that weapon should be held strictly liable for any injuries resulting from its misuse. They contend that this is "nothing more than a [P]roduct [L]iability [A]ct claim dressed in the robes of CUTPA"; *Gerrity* v. *R.J. Reynolds Tobacco Co.*, 263 Conn. 120, 129, 818 A.2d 769 (2003); and that, pursuant to § 52-572n (a), the Product Liability Act provides the exclusive remedy. We are not persuaded.

As we have explained, the plaintiffs' wrongful death claims are predicated on two distinct theories of unfair trade practice: (1) the sale of assault rifles such as the XM15-E2S to the civilian market is inherently unreasonable and dangerous; and (2) the defendants marketed and promoted the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner. The defendants' primary argument with respect to the Product Liability Act relates to the plaintiffs' first theory of liability. Because we have concluded that claims predicated on the plaintiffs' first CUTPA based theory of liability are time barred, however, we need not determine whether those claims also are precluded by § 52-572n (a). Cf. footnote 14 of this opinion.

With respect to the plaintiffs' second theory of liability, the defendants fail to offer any explanation as to why the allegation that they wrongfully marketed the XM15-E2S by promoting the gun's use for illegal purposes—offensive, military style assault missions—amounts to a product defect claim.[33] There is no allegation in the present case, for example, that the marketing for the XM15-E2S contained inadequate warnings that made the weapon unreasonably dangerous.

The defendants' sole argument in this regard is their contention that, in *Merrill* v. *Navegar, Inc.*, supra, 26 Cal. 4th 465, the California Supreme Court rejected allegations of wrongful firearms marketing as disguised product liability claims. We read *Merrill* differently. It is true that the California Supreme Court concluded that many of the negligent marketing and distribution claims at issue in that case were barred by a California statute that provided that a gun manufacturer may not be held liable in a product liability action on the basis that the benefits of its product fail to outweigh the product's risk of injury when discharged. Id., 470; see Cal. Civ. Code § 1714.4 (a) (Deering 1994) (repealed in 2002). But the claims in *Merrill*, while dressed in terms of negligent marketing and distribution, were substantially similar to the claims of the plaintiffs in the present case, namely, that the sale of assault weapons to the civilian market is inherently unreasonable because those weapons have no legitimate civilian purpose. See *Merrill* v. *Navegar, Inc.*, supra, 470, 480–81.

The only claims at issue in *Merrill* that were akin to the plaintiffs' immoral advertising claims were their allegations that Navegar, Inc. (Navegar), a gun manufacturer, advertised its semiautomatic assault pistols "as tough as your toughest customer" and as featuring "excellent resistance to finger prints," which might have suggested that the weapons were especially well suited for criminal use. (Internal quotation marks omitted.) Id., 471. In holding that the trial court had properly granted Navegar's motion for summary judgment with respect to those "more inflammatory aspects of Navegar's advertising"; id., 489; however, the California Supreme Court relied not on the immunity provision in California's product liability statute but, rather, on the facts that (1) the plaintiffs in *Merrill* expressly disavowed any claims based on the specific content of Navegar's advertising; id., 474, 487–88; and (2) there was no evidence that the shooter in that case ever had seen, let alone had been inspired by, any of Navegar's allegedly inappropriate promotional materials. Id., 471, 473, 488–91. Accordingly, we do not read *Merrill* as supporting the defendants' contention that the wrongful advertising claims in the present case are merely masked product defect claims.

The defendants have offered no other arguments as to why the plaintiffs' wrongful advertising claims repre-

sent veiled product liability claims. Accordingly, we conclude that those claims are not precluded by § 52-572n (a). See *Gerrity* v. *R.J. Reynolds Tobacco Co.*, supra, 263 Conn. 124, 128 (analyzing language of exclusivity provision and concluding that claim that tobacco companies violated CUTPA by targeting minors with their cigarette advertising did not allege product defect and, therefore, was not precluded by Product Liability Act).

D

CUTPA Personal Injury Damages

We next consider the defendants' argument that personal injuries resulting in death do not give rise to cognizable damages for purposes of CUTPA.[34] As we explained, an action for wrongful death will lie only if the deceased, had he or she survived, would have had a valid claim for the injuries that resulted in death. See part IV B of this opinion. For that reason, the plaintiffs can prevail on their CUTPA based wrongful death claims only if CUTPA permits the recovery of damages for the decedents' injuries. As a matter of first impression, we hold that CUTPA permits recovery for personal injuries that result directly from wrongful advertising practices.[35]

Whether personal injuries give rise to cognizable CUTPA damages presents a question of statutory interpretation. We begin by setting forth the relevant statutory language. Subsection (a) of § 42-110g contains two clauses potentially relevant to the issue before us. First, subsection (a) creates a private right of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." This provision is known as the ascertainable loss clause. Second, subsection (a) provides that any person so injured "may bring an action . . . to recover actual damages." This provision of subsection (a) is known as the actual damages clause.

The view of the plaintiffs is that these two clauses serve distinct, independent functions within the statute and that only the actual damages clause restricts the types of damages that are available. Specifically, they contend that, although one must suffer some ascertainable loss of money or property in order to have *standing* to bring a CUTPA action, once the standing requirements set by the ascertainable loss clause have been satisfied, a successful plaintiff may *recover* not only for those financial losses but for any and all actual damages. Relying on *DiNapoli* v. *Cooke*, 43 Conn. App. 419, 427, 682 A.2d 603, cert. denied, 239 Conn. 951, 686 A.2d 124 (1996), cert. denied, 520 U.S. 1213, 117 S. Ct. 1699, 137 L. Ed. 2d 825 (1997), the plaintiffs further contend that the term "actual damages" is synonymous with compensatory or general damages and excludes only

special damages such as nominal and punitive damages. Certainly, they contend, that term is sufficiently expansive to encompass personal injuries.

The defendants, by contrast, argue that the ascertainable loss clause modifies and cabins the meaning of the actual damages clause. In their view, the fact that a plaintiff must have suffered some manner of financial loss to bring a CUTPA action implies that the legislature intended to limit recovery to damages of that sort. Insofar as both of these interpretations of the statutory language are facially plausible,[36] we conclude that the statute is ambiguous and that we may properly look to extratextual sources to ascertain the intent of the legislature. See General Statutes § 1-2z.

The legislative histories of CUTPA and of the model legislation on which CUTPA is based are largely silent with respect to the question of personal injury damages. R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2018–19 Ed.) § 6.7, pp. 849, 851. Nevertheless, four considerations persuade us that the legislature did not intend to bar plaintiffs from recovering for personal injuries resulting from unfair trade practices, at least under circumstances such as those presented here.

First, although both the plaintiffs' and the defendants' interpretations of the statutory language are facially plausible, the plaintiffs' reading of § 42-110g (a) is more reasonable. While the term "actual damages" is not defined in CUTPA, the term is used in other statutes in such a manner as to leave no doubt that actual damages include personal injuries. For example, General Statutes § 53-452 (a) provides in relevant part that "[a]ny person whose property *or person* is injured by [a computer crime committed in violation of] section 53-451 may bring a civil action in the Superior Court to enjoin further violations and to recover the *actual damages* sustained by reason of such violation . . . ." (Emphasis added.)

In addition, the plaintiffs' interpretation of the statute better comports with our analysis in *Hinchliffe* v. *American Motors Corp.*, supra, 184 Conn. 612–20. In that case, we considered the closely related question of whether the "ascertainable loss" requirement means that a CUTPA plaintiff must be able to prove that he or she has suffered actual damages in a particular amount. Id., 612–13. We rejected that reading of the statute, concluding that the ascertainable loss and actual damage clauses of § 42-110g (a) serve distinct purposes and that the legislature did not intend the term "ascertainable" to modify "actual damages." Id., 613–15. We also cited favorably the view of one legal scholar that "the only function served by a threshold 'loss' requirement in a consumer protection statute is to guard against vicarious suits by self-constituted attorneys general when they spot an apparently deceptive

advertisement in the newspaper, on television or in a store window." Id., 615 n.6, citing D. Rice, "New Private Remedies for Consumers: The Amendment of Chapter 93A," 54 Mass. L.Q. 307, 314 (1969). That view, if correct, strongly supports the conclusion that the presence of the ascertainable loss clause in the statute in no way restricts the damages that are available to plaintiffs who have been directly and personally injured by an unfair trade practice.

Second, we frequently have remarked that "CUTPA's coverage is broad and its purpose remedial." (Internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 113–14, 612 A.2d 1130 (1992); see also 12 R. Langer et al., supra, § 2.5, p. 81. As we explained in part IV A of this opinion, whereas unfair trade practices such as false advertising and other forms of commercial deception tend to result primarily in financial harm, a principal evil associated with unethical and unscrupulous advertising is that viewers or innocent third parties will be physically injured as a result of dangerous or illegal conduct depicted in the advertisements. See, e.g., *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 556–61, 121 S. Ct. 2404, 150 L. Ed. 2d 532 (2001). That is precisely what the plaintiffs in the present case allege. If personal injuries are not recoverable under those circumstances, then no recovery will be available for a substantial category of unfair trade practices, and the threat of private litigation will not serve as a deterrent to such conduct. That outcome would be inconsistent with the stated intent of the legislature to provide broad protection from unfair trade practices and to incentivize private enforcement of the law.

Third, it is well established that the legislature intended that Federal Trade Commission (FTC) rulings and cases decided under the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 41 et seq. (2012 and Supp. V 2017), would "serve as a lodestar" for interpreting CUTPA's open-ended language.[37] *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 179, 510 A.2d 972 (1986).[38] Notably, the FTC itself has construed the FTC Act as prohibiting practices that are physically dangerous to consumers. See J. Beales III, "Advertising to Kids and the FTC: A Regulatory Retrospective That Advises the Present," 12 Geo. Mason L. Rev. 873, 876 (2004). In *In re International Harvester Co.*, 104 F.T.C. 949 (1984), for example, the FTC held that a manufacturer's failure to adequately disclose safety risks associated with fuel geysering in its tractors represented an unfair trade practice that violated the FTC Act. See id., 1066–67. In reaching this conclusion, the FTC relied on the fact that fuel geysering is a hazard that creates a substantial risk of injury or death: "There clearly has been serious consumer injury. At least one person has been killed and eleven others burned. . . . Many of the burn injuries have been major ones, moreover, resulting in mobil-

ity limitations, lasting psychological harm, and severe disfigurement. . . . These injuries are of a kind that satisfies the . . . unfairness test. It is true that they involve physical rather than economic injury, but the [u]nfairness [s]tatement reaches such matters." (Citations omitted.) Id., 1064; see also *In re LabMD, Inc.*, Docket No. 9357, 2016 WL 521327, *12 (F.T.C. January 14, 2016) ("unquantifiable health and safety risks" can give rise to unfair trade practice injuries).

Of particular relevance to the present action, the FTC has, on multiple occasions, found violations of the FTC Act when companies have advertised or promoted their products in a manner that is likely to result in physical injury, even in the absence of product sales. For example, the FTC has required companies to refrain from advertising that depicts young children operating bicycles and tricycles in an unsafe or unlawful manner; *In re AMF, Inc.*, 95 F.T.C. 310, 313–15 (1980); advertising the use of electric hairdryers by children in close proximity to a filled bathroom sink; See *In re Mego International, Inc.*, 92 F.T.C. 186, 187, 189–90 (1978); and advertising that depicts children attempting to cook food without close adult supervision; *In re Uncle Ben's, Inc.*, 89 F.T.C. 131, 136 (1977); as well as promotional giveaways that expose young children to unguarded razor blades. See *In re Philip Morris, Inc.*, 82 F.T.C. 16, 19 (1973). The FTC concluded that such marketing activities had the tendency to induce behavior that involves an unreasonable risk of harm to person or property and, therefore, constituted unfair trade practices.

In 1997, Federal Trade Commissioner Roscoe B. Starek III underscored the FTC's interest in combating unfair trade practices that may result in physical injuries to children: "Although injury must be both substantial and likely" to draw the FTC's attention, "unwarranted health or safety risks can suffice." R. Starek III, "The ABCs at the FTC: Marketing and Advertising to Children," Address at the Minnesota Institute of Legal Education (July 25, 1997), available at https://www.ftc.gov/public-statements/1997/07/abcs-ftc-marketing-and-advertising-children (last visited March 8, 2019). More recently, the FTC has taken an interest in the marketing of violent movies, songs, and video games to children. See, e.g., Federal Trade Commission, Report to Congress, "Marketing Violent Entertainment to Children: A Sixth Follow-up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries (December, 2009), available at 2009 WL 5427633. It is clear, then, that wrongful advertising that poses a genuine risk of physical harm falls under the broad purview of the FTC Act and, by incorporation, CUTPA.

Fourth, we observe that courts in several of our sister states have concluded that victims of unfair trade prac-

tices may recover for personal injuries. See, e.g., *Pope* v. *Rollins Protective Services Co.*, 703 F.2d 197, 203 (5th Cir. 1983) (applying Texas law); *Maurer* v. *Cerkvenik-Anderson Travel, Inc.*, 181 Ariz. 294, 297–98, 890 P.2d 69 (App. 1994); *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 192, 552 N.E.2d 95 (1990). Although we recognize that the statutory language at issue in those cases was not identical to the language at issue in this case, we nevertheless find it significant that sister courts have understood personal injuries to fall within the scope of the harms to which broadly worded consumer protection statutes are directed. In addition, we note that a majority of Connecticut trial courts addressing the issue have concluded that damages for personal injuries can be recovered under CUTPA. 12 R. Langer et al., supra, § 6.7, p. 850. For all of these reasons, we conclude that, at least with respect to wrongful advertising claims, personal injuries alleged to have resulted directly from such advertisements are cognizable under CUTPA.

V

WRONGFUL DEATH AND CUTPA:
ISSUES OF FEDERAL LAW

Having concluded that the plaintiffs have pleaded legally cognizable CUTPA claims sounding in wrongful marketing, we next consider whether the trial court properly determined that PLCAA does not bar the plaintiffs' wrongful death claims. Our review of the federal statute persuades us that the trial court correctly concluded that CUTPA, as applied to the plaintiffs' allegations, falls within one of PLCAA's exceptions.

A

PLCAA Overview

PLCAA generally affords manufacturers and sellers of firearms[39] immunity from civil liability arising from the criminal or unlawful use of their products by third parties. 15 U.S.C. §§ 7902 (a) and 7903 (5) (A) (2012).[40] Congress carved out six exceptions to this immunity, pursuant to which firearms sellers may be held liable for third-party crimes committed with their products. See 15 U.S.C. § 7903 (5) (A) (2012). The exception at issue in the present case, the predicate exception; see footnote 12 of this opinion and accompanying text; permits civil actions alleging that "a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm], and the violation was a proximate cause of the harm for which relief is sought . . . ." 15 U.S.C. § 7903 (5) (A) (iii) (2012). The question presented by this appeal is whether CUTPA qualifies as such a predicate statute, that is, a "statute *applicable* to the sale or marketing of [firearms] . . . ." (Emphasis added.) 15 U.S.C. § 7903 (5) (A) (iii) (2012). The answer to this question necessarily hinges on the meaning and scope of the statutory term "applicable." See *Ileto* v. *Glock*,

*Inc.*, 565 F.3d 1126, 1133 (9th Cir. 2009), cert. denied, 560 U.S. 924, 130 S. Ct. 3320, 176 L. Ed. 2d 1219 (2010).

"[W]e begin by setting forth the rules and principles that govern our interpretation of federal law. With respect to the construction and application of federal statutes, principles of comity and consistency require us to follow the plain meaning rule . . . ." (Internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, 327 Conn. 114, 140, 172 A.3d 1228 (2017). "Under the [federal] plain meaning rule, [l]egislative history and other tools of interpretation may be relied [on] only if the terms of the statute are ambiguous." (Internal quotation marks omitted.) *Webster Bank* v. *Oakley*, 265 Conn. 539, 555, 830 A.2d 139 (2003), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004). "If the text of a statute is ambiguous, then we must construct an interpretation consistent with the primary purpose of the statute as a whole. . . . Thus, our interpretive process will begin by inquiring whether the plain language of [the] statute, when given its ordinary, common meaning . . . is ambiguous." (Citations omitted; internal quotation marks omitted.) Id., 555–56. In assessing ambiguity, the meaning of the statute must be evaluated not only by reference to the language itself but also in the specific context in which that language is used, as well as in the broader context of the statute as a whole. *New York* v. *Beretta U.S.A. Corp.*, 524 F.3d 384, 400 (2d Cir. 2008), cert. denied, 556 U.S. 1104, 129 S. Ct. 1579, 173 L. Ed. 2d 675 (2009).

B

The Plain Language of the Statute

Both the plaintiffs and the defendants contend that the plain language of the predicate exception, read in the context of the broader statute, unambiguously favors their position. In this part of the opinion, we explain why the plaintiffs' interpretation of the statutory language is plainly the more reasonable one. We consider the text of the predicate exception itself, the broader statutory framework, the congressional statement of findings and purposes, and the defendants' argument that treating CUTPA as a predicate statute would lead to absurd results.

Although we agree with the plaintiffs that their reading of the statutory language is the better one, we recognize that the defendants' interpretation is not implausible. Therefore, in part V C of the opinion, we also review various extrinsic sources of congressional intent to resolve any ambiguities. Our review of both the statutory language and these extrinsic sources persuades us that Congress did not mean to preclude actions alleging that firearms companies violated state consumer protection laws by promoting their weapons for illegal, criminal purposes.

1

The Predicate Exception

When construing a federal law in which key terms are undefined, we begin with the ordinary, dictionary meaning of the statutory language. See, e.g., *Maslenjak* v. *United States*,    U.S.    , 137 S. Ct. 1918, 1924, 198 L. Ed. 2d 460 (2017). Looking to dictionaries that were in print around the time PLCAA was enacted, we find that the principal definition of "applicable" is simply "[c]apable of being applied . . . ." Black's Law Dictionary (10th Ed. 2014) p. 120; accord Webster's Third New International Dictionary (2002) p. 105.

If Congress had intended to create an exception to PLCAA for actions alleging a violation of any law that is capable of being applied to the sale and marketing of firearms, then there is little doubt that state consumer protection statutes such as CUTPA would qualify as predicate statutes. CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of *any trade or commerce.*" (Emphasis added.) General Statutes § 42-110b (a). Accordingly, the statute clearly is capable of being applied to the sale and marketing of firearms. The only state appellate court to have reviewed the predicate exception construed it in this manner; see *Smith & Wesson Corp.* v. *Gary*, 875 N.E.2d 422, 431, 434–35 and n.12 (Ind. App. 2007) (predicate exception unambiguously applies to any state law capable of being applied to sale or marketing of firearms), transfer denied, 915 N.E. 978 (Ind. 2009).

It is true that secondary dictionary definitions of "applicable" might support a narrower reading of the predicate exception. Webster's Third New International Dictionary, for example, also defines "applicable" as "fit, suitable, or right to be applied: appropriate . . . relevant . . . ." Webster's Third New International Dictionary, supra, p. 105. Pursuant to such definitions, the Ninth Circuit concluded, it would not be unreasonable to read PLCAA to exempt only those state laws that are *exclusively* relevant to the sale or marketing of firearms. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1134.

If Congress had intended to limit the scope of the predicate exception to violations of statutes that are *directly*, *expressly*, or *exclusively* applicable to firearms, however, it easily could have used such language, as it has on other occasions.[41] The fact that the drafters opted instead to use only the term "applicable," which is susceptible to a broad reading, further supports the plaintiffs' interpretation. See, e.g., *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 219, 38 A.3d 1183 ("the legislature knows how to . . . use broader or limiting terms when it chooses to do so" [citation omitted]), cert. denied, 568 U.S. 940, 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012).

The Statutory Framework

In construing the predicate exception, we also must consider the broader statutory framework. The plaintiffs' contention that CUTPA qualifies as a predicate statute as applied to their wrongful marketing claims finds additional support in the repeated statutory references to laws that govern the marketing of firearms.

There is no doubt that statutes that govern the advertising and marketing of firearms potentially qualify as predicate statutes. The predicate exception expressly provides that the "qualified civil liability actions" from which firearms sellers are immune shall not include "an action in which a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or *marketing* of the [firearm] . . . ."[42] (Emphasis added.) 15 U.S.C. § 7903 (5) (A) (iii) (2012).

Importantly, however, at the time PLCAA was enacted, no federal statutes directly or specifically regulated the marketing or advertising of firearms. In addition, only a handful of states have enacted firearm specific laws that address in any way the marketing function, and none of those purports to comprehensively regulate the advertising of firearms.[43] It would have made little sense for the drafters of the legislation to carve out an exception for violations of laws applicable to the marketing of firearms if no such laws existed.[44]

If Congress intended the predicate exception to encompass laws that prohibit the wrongful marketing of firearms, and if no laws expressly and directly do so, then the only logical reading of the statute is that Congress had some other type of law in mind. What type? At both the federal and state levels, false, deceptive, and other forms of wrongful advertising are regulated principally through unfair trade practice laws such as the FTC Act and its state analogues.[45] We must presume that Congress was aware, when it enacted PLCAA, that both the FTC Act and state analogues such as CUTPA have long been among the primary vehicles for litigating claims that sellers of potentially dangerous products such as firearms have marketed those products in an unsafe and unscrupulous manner. See *Goodyear Atomic Corp.* v. *Miller*, 486 U.S. 174, 185, 108 S. Ct. 1704, 100 L. Ed. 2d 158 (1988) (Congress is presumptively knowledgeable about pertinent federal and state law). CUTPA, for example, has long been construed to incorporate the FTC's traditional "cigarette rule," which prohibits as unfair advertising that is, among other things, "immoral, unethical, oppressive and unscrupulous."[46] *Ivey, Barnum & O'Mara* v. *Indian Harbor Properties, Inc.*, 190 Conn. 528, 539 and n.13, 461 A.2d 1369 (1983).

Reading the predicate exception to encompass actions brought to remedy illegal and unscrupulous

marketing practices under state consumer protection laws is consistent with the approach followed by the United States Court of Appeals for the Second Circuit, whose decisions "carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts." (Internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, supra, 327 Conn. 140. In *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d 384, the Second Circuit considered whether PLCAA barred the municipal plaintiffs' action alleging that distribution practices of the defendant firearms manufactures and sellers violated a New York criminal nuisance statute; see N.Y. Penal Law § 240.45 (McKinney 2008); by marketing guns to legitimate buyers with the knowledge that those guns will be diverted into illegal markets. See *New York* v. *Beretta U.S.A. Corp.*, supra, 389–90. The court concluded that the action should have been dismissed because the nuisance statute was a law of general applicability that had never been applied to the firearms trade and simply did not "encompass the conduct of firearms manufacturers of which the [municipal plaintiffs] complain[ed]." Id., 400. Notably, in reaching that conclusion, the Second Circuit held that the predicate exception encompasses not only laws that expressly regulate commerce in firearms but also those that "clearly can be said to implicate the purchase and sale of firearms," as well as laws of general applicability that "courts have applied to the sale and marketing of firearms . . . ."[47] Id., 404. CUTPA falls squarely into both of these categories.

Statutes such as the FTC Act and state analogues that prohibit the wrongful marketing of dangerous consumer products such as firearms represent precisely the types of statutes that implicate and have been applied to the sale and marketing of firearms. In the early 1970s, for example, the FTC entered into consent decrees with three firearms sellers relating to allegations that they had precluded their dealers from advertising their guns at lower than established retail prices.[48] A few years later, the FTC ordered Emdeko International, Inc., a marketing company, to refrain from predatory and misleading advertising regarding various consumer products, including firearms. See *In re National Housewares, Inc.*, 90 F.T.C. 512, 516, 587–88, 601–603 (1977).

CUTPA also has been applied to the sale of firearms. For example, in *Salomonson* v. *Billistics, Inc.*, Superior Court, Judicial District of New London, Docket No. CV-88-508292 (September 27, 1991), the plaintiff prevailed on his claim that the defendant gun dealer's sales practices relating to the sale of a Ruger pistol and three remanufactured semiautomatic rifles violated CUTPA.[49] Id. The court specifically found that the defendant's conduct was "oppressive" and, therefore, violated the second prong of the cigarette rule, the same standard at issue in the present case. Id.

Equally important, regulation of firearms advertising in our sister states frequently has been accomplished under the auspices of state consumer protection and unfair trade practice laws.[50] It is clear, therefore, that consumer protection statutes such as CUTPA long have been an established mechanism for regulating the marketing and advertising schemes of firearms vendors.

The FTC Act and its various state analogues also have been applied in numerous instances to the wrongful marketing of other potentially dangerous consumer products, especially with respect to advertisements that promote unsafe or illegal conduct.[51] See S. Calkins, "FTC Unfairness: An Essay," 46 Wayne L. Rev. 1935, 1962, 1974 (2000). Although Congress temporarily curtailed the FTC's authority to regulate unfair commercial advertising in 1980, that authority was reinstated in 1994. Id., 1954–55.

Subsequently, just a few years before Congress began considering predecessor legislation to PLCAA, the FTC entered into a new consent decree addressing wrongful advertising. In *In re Beck's North America, Inc.*, Docket No. C-3859, 1999 FTC LEXIS 40 (F.T.C. March 25, 1999), the commission prohibited the publication of advertisements that portrayed young adult passengers consuming alcohol while sailing, in a manner that was unsafe and depicted activities that "may also violate federal and state boating safety laws." Id., *2. The consent decree prohibited the "future dissemination . . . of any . . . advertisement that . . . depicts activities that would violate [federal laws that make] it illegal to operate a vessel under the influence of alcohol or illegal drugs." (Citations omitted.) *In re Beck's North America, Inc.*, File No. 982-3092, 1998 FTC LEXIS 83, *15–16 (F.T.C. August 6, 1998). More generally, the FTC cautioned that it "ha[d] substantial concern about advertising that depicts conduct that poses a high risk to health and safety. As a result, the [FTC] will closely scrutinize such advertisements in the future." Id., *15.[52]

Because Congress clearly intended that laws governing the marketing of firearms would qualify as predicate statutes, and because Congress is presumed to be aware that the wrongful marketing of dangerous items such as firearms for unsafe or illegal purposes traditionally has been and continues to be regulated primarily by consumer protection and unfair trade practice laws rather than by firearms specific statutes, we conclude that the most reasonable reading of the statutory framework, in light of the decision of the Second Circuit in *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d 384, is that laws such as CUTPA qualify as predicate statutes, insofar as they apply to wrongful advertising claims.[53]

3

The Statement of Findings and Purposes

When it drafted PLCAA, Congress included a state-

ment of findings and purposes. See 15 U.S.C. § 7901 (2012). In his dissenting opinion, Justice Robinson reads this statement to support the position of the defendants. On balance, however, we conclude, for the following reasons, that the congressional findings and purposes also lend support to the plaintiffs' interpretation of the statute.

First, Title 15 of the 2012 edition of the United States Code, § 7901 (a) (4), provides that "[t]he *manufacture*, *importation*, *possession*, *sale*, *and use* of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws . . . [s]uch [as] . . . the Gun Control Act of 1968, the National Firearms Act . . . and the Arms Export Control Act . . . ." (Citations omitted; emphasis added.) Notably, this provision, which expressly references various firearms specific laws, makes no mention of the marketing function. By contrast, the very next finding expressly references the "lawful . . . marketing . . . of firearms . . . ."[54] 15 U.S.C. § 7901 (a) (5) (2012). Reading these two findings in concert, it is clear that Congress chose not to abrogate the well established duty of firearms sellers to market their wares legally and responsibly, even though no federal laws specifically govern the marketing of firearms.

Second, although the findings indicate that Congress sought to immunize the firearms industry from liability for third-party criminal conduct, they emphasize that that immunity extended only to "harm that is *solely* caused by others . . . ." (Emphasis added.) 15 U.S.C. § 7901 (a) (6) (2012); see also 15 U.S.C. § 7901 (b) (1) (2012) (principal purpose of PLCAA is to prohibit causes of action "for the harm *solely* caused by the criminal or unlawful misuse of firearm products" [emphasis added]); *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1158 (Berzon, J., concurring in part and dissenting in part) (same). The statement of findings and purposes further provides that the purpose of PLCAA is "[t]o preserve a citizen's access to a supply of firearms and ammunition for all *lawful* purposes, including hunting, self-defense, collecting, and competitive or recreational shooting." (Emphasis added.) 15 U.S.C. § 7901 (b) (2) (2012). In the present case, the plaintiffs allege that the defendants *illegally* marketed the XM15-E2S by promoting its criminal use for offensive civilian assaults, and that this wrongful advertising was a direct cause of the Sandy Hook massacre. At no time and in no way does the congressional statement indicate that firearm sellers should evade liability for the injuries that result if they promote the illegal use of their products.

Third, the findings make clear that Congress sought to preclude only novel civil actions that are "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the com-

mon law," recognition of which "would expand civil liability in a manner never contemplated . . . by Congress . . . or by the legislatures of the several States." 15 U.S.C. § 7901 (a) (7) (2012). As we previously discussed, however, it is well established that the FTC Act and state analogues such as CUTPA not only govern the marketing of firearms, but also prohibit advertisements that promote or model the unsafe or illegal use of potentially dangerous products. Accordingly, there is simply no reason to think that the present action represents the sort of novel civil action that Congress sought to bar.[55]

The dissent relies on one other provision of the statement of findings and purposes that purportedly disqualifies CUTPA, as applied to the plaintiffs' wrongful marketing theory, as a potential predicate statute. Specifically, the statement emphasizes the importance of preserving the rights enshrined in the second amendment to the United States constitution. See 15 U.S.C. § 7901 (a) (1), (2) and (6) (2012).

There is no doubt that congressional supporters of PLCAA were committed to Americans' second amendment freedoms and sought to secure those freedoms by immunizing firearms companies from frivolous lawsuits. It is not at all clear, however, that the second amendment's protections even extend to the types of quasi-military, semiautomatic assault rifles at issue in the present case. See *District of Columbia* v. *Heller*, 554 U.S. 570, 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) (indicating that second amendment's protection does not extend to " 'dangerous and unusual weapons' " and, therefore, that M16s and related military style rifles may be banned); *Kolbe* v. *Hogan*, 849 F.3d 114, 143 (4th Cir.) (reading *Heller* to mean that second amendment does not protect right to possess assault weapons featuring high capacity magazines, such as AR-15), cert. denied, U.S. , 138 S. Ct. 469, 199 L. Ed. 2d 374 (2017); *New York State Rifle & Pistol Assn., Inc.* v. *Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015) (assuming for sake of argument that second amendment does apply to semiautomatic assault weapons such as AR-15 but upholding outright prohibitions against civilian ownership of such weapons), cert. denied sub nom. *Shew* v. *Malloy*, U.S. , 136 S. Ct. 2486, 195 L. Ed. 2d 822 (2016); see also *Friedman* v. *Highland Park*, 784 F.3d 406, 410–12 (7th Cir.), cert. denied, U.S. , 136 S. Ct. 447, 193 L. Ed. 2d 483 (2015); *Fyock* v. *Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015); *Heller* v. *District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). Accordingly, we conclude that, on balance, PLCAA's statement of findings and purposes also bears out the plaintiffs' interpretation of the statute, namely, that illegal marketing is not protected.[56]

4

Absurd Result

We next address the defendants' argument that construing a statute of general applicability such as CUTPA to be a predicate statute would lead to an absurd result. As one judge has articulated, "the predicate exception cannot possibly encompass every statute that might be 'capable of being applied' to the sale or manufacture of firearms; if it did, the exception would swallow the rule, and no civil lawsuits would ever be subject to dismissal under . . . PLCAA." (Emphasis omitted.) *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1155 (Berzon, J., concurring in part and dissenting in part).

Of course, to surmount PLCAA immunity via the predicate exception, there must be at least a colorable claim that a defendant has, in fact, violated some statute, resulting in harm to the plaintiff. Accordingly, Judge Berzon's argument appears to be predicated on the assumptions that (1) most states have public nuisance statutes or similar laws, such as the California nuisance statutes at issue in *Ileto*, and (2) virtually any action seeking to hold firearms sellers liable for third-party gun violence could allege a colorable violation of those statutes because the mere act of selling the weapons involved might be deemed to create a public nuisance.

We will assume, without deciding, that Judge Berzon is correct that, as a general matter, the predicate exception cannot be so expansive as to fully encompass laws such as public nuisance statutes insofar as those laws reasonably might be implicated in any civil action arising from gun violence.[57] Although we believe that the plaintiffs' primary allegations—that any sale of assault weapons to the civilian market constitutes an unfair trade practice—would falter on this shoal, we need not address that issue more fully in light of our determination that those allegations are time barred. See part IV B of this opinion. What is clear, however, is that the plaintiffs' wrongful marketing allegations may proceed without crippling PLCAA. Those claims allege only that one specific family of firearms sellers advertised one particular line of assault weapons in a uniquely unscrupulous manner, promoting their suitability for illegal, offensive assaults. As we have stated throughout this opinion, we do not know whether the plaintiffs will be able to prove those allegations to a jury. But we are confident that this sort of specific, narrowly framed wrongful marketing claim alleges precisely the sort of illegal conduct that Congress did not intend to immunize. For this reason, CUTPA's prohibition against such conduct appears to fall squarely within the predicate exception and does not lead to an absurd result.

C

Extrinsic Evidence of Congressional Intent

Other courts that have construed the predicate exception are divided as to whether the exception unambiguously encompasses laws, such as CUTPA, that do not

expressly regulate firearms sales and marketing but are nevertheless capable of being and have been applied thereto. Compare *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1133–35 (predicate exception is ambiguous), and *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d 401 (same), with *Smith & Wesson Corp.* v. *Gary*, 875 N.E.2d 422, 431, 434 and n.12 (predicate exception unambiguously applies), and *New York* v. *Beretta U.S.A. Corp.*, supra, 405–407 (Katzmann, J., dissenting) (same). In part V B of this opinion, we explained why the plain text of 15 U.S.C. § 7903 (5) (A) (iii) strongly suggests that CUTPA, as applied to the plaintiffs' claims, qualifies as a predicate statute. In this part, we explain why extrinsic indicia of congressional intent support the same conclusion. These indicia include canons of statutory construction, closely related legislation, and the legislative history of PLCAA.

1

Canons of Statutory Construction

Under the law of the Second Circuit, if the plain language of a statute is ambiguous, we then consider whether any ambiguities may be resolved by the application of canons of statutory construction and, failing that, through review of the legislative history. E.g., *United States* v. *Rowland*, 826 F.3d 100, 108 (2d Cir. 2016), cert. denied,        U.S.      , 137 S. Ct. 1330, 197 L. Ed. 2d 517 (2017). In the present case, three canons of construction are potentially relevant.

a

Clear Statement Requirement

We begin with the well established canon that a federal law is not to be construed to have superseded the historic police powers of the states unless that was the clearly expressed and manifest purpose of Congress. E.g., *Cipollone* v. *Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992); *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947); *Federal Housing Finance Agency* v. *Nomura Holding America, Inc.*, 873 F.3d 85, 112 n.30 (2d Cir. 2017), cert. denied,      U.S.     , 138 S. Ct. 2679, 201 L. Ed. 2d 1073 (2018), and cert. denied sub nom. *Findlay* v. *Federal Housing Finance Agency*,       U.S.       , 138 S. Ct. 2697, 201 L. Ed. 2d 1073 (2018). The regulation of advertising that threatens the public health, safety, and morals has long been considered a core exercise of the states' police powers. See, e.g., *Altria Group, Inc.* v. *Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008); *Semler* v. *Oregon State Board of Dental Examiners*, 294 U.S. 608, 611–12, 55 S. Ct. 570, 79 L. Ed. 1086 (1935); *Varney & Green* v. *Williams*, 155 Cal. 318, 321, 100 P. 867 (1909), overruled in part on other grounds by *Metromedia, Inc.* v. *San Diego*, 26 Cal. 3d 848, 610 P.2d 407, 164 Cal. Rptr. 510 (1980); *State* v. *Certain Contraceptive Materials*, 7

Conn. Supp. 264, 277–78 (1939), rev'd on other grounds, 126 Conn. 428, 11 A.2d 863 (1940). Accordingly, we will find the plaintiffs' CUTPA action to be superseded by PLCAA only if that is the clearly expressed intent of Congress.[58]

In the case of PLCAA, there is no indication in the statutory text or statement of findings and purposes that Congress intended to restrict the power of the states to regulate wrongful advertising, particularly advertising that encourages consumers to engage in egregious criminal conduct. Indeed, sponsors of the legislation repeatedly emphasized during the legislative hearings that they did *not* intend to abrogate well established legal principles.[59] Accordingly, in the absence of a clear statement in the statutory text or legislative history that Congress intended to supersede the states' traditional authority to regulate the wrongful advertising of dangerous products such as firearms, we are compelled to resolve any textual ambiguities in favor of the plaintiffs.

b

Ejusdem Generis

The defendants contend that a different canon of construction, namely, ejusdem generis, essentially resolves any statutory ambiguity in their favor. Specifically, from the fact that PLCAA provides two examples of predicate federal statutes, both of which specifically relate to firearms, the defendants infer that all predicate statutes must be of that same ilk.[60] We are not persuaded.

When it drafted the predicate exception, Congress set forth two examples of statutes that are applicable to the sale or marketing of firearms. PLCAA provides that entities engaged in the firearms business are not immune from liability with respect to "an action in which a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm] . . . including—

"(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the [firearm], or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a [firearm]; or

"(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a [firearm], knowing, or having reasonable cause to believe, that the actual buyer of the [firearm] was prohibited from possessing or receiving a firearm . . . under subsection (g) or (n) of section 922 of title 18 [of the United States Code] . . . ."[61] 15 U.S.C. § 7903 (5) (A) (iii) (2012) (setting

forth record keeping and unlawful buyer exceptions).

The defendants argue that we can discern the scope of the predicate exception by applying ejusdem generis. That canon applies when a statute sets forth a general category of persons or things and then enumerates specific examples thereof. In those cases, when the scope of the general category is unclear, a presumption, albeit a rebuttable one, may arise that the general category encompasses only things similar in nature to the specific examples that follow. See, e.g., 2A N. Singer & S. Singer, Statutes and Statutory Construction (7th Ed. 2014) § 47:17, pp. 364–68. Several courts have acknowledged the potential relevance of the canon when construing the predicate exception. See, e.g., *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d 401–402.

It is well established, however, that ejusdem generis, like other canons of construction, is merely a tool to assist us in gleaning the intent of Congress; it should not be applied in the face of a contrary manifestation of legislative intent. *Helvering* v. *Stockholms Enskilda Bank*, 293 U.S. 84, 88–89, 55 S. Ct. 50, 79 L. Ed. 211 (1934); 2A N. Singer & S. Singer, supra, § 47:22, pp. 400–404. This is particularly true, for example, when the legislative history of a statute reveals a contrary intent. See 2A N. Singer & S. Singer, supra, § 47:22, pp. 404–405.

In the case of PLCAA, the legislative history of the statute makes clear why Congress specifically chose to include the record keeping and unlawful buyer exceptions when drafting the final version of the predicate exception. Bills substantially similar to PLCAA had been introduced in both the 107th Congress and the 108th Congress. See S. 1805, 108th Cong. (2003), H.R. 1036, 108th Cong. (2003); H.R. 2037, 107th Cong. (2001). Those bills contained the same exemption for "State or Federal statute[s] applicable to the sale or marketing of [firearms]" that ultimately was codified at 15 U.S.C. § 7903 (5) (A) (iii). H.R. 2037, supra, § 4; accord S. 1805, supra, § 4; H.R. 1036, supra, § 4. Notably, however, they did not include the record keeping or the unlawful buyer exception. Indeed, they did not offer any specific examples of predicate statutes.

The legislative history indicates that the record keeping and unlawful buyer illustrations were added to the bill that became law during the 109th Congress not to define or clarify the narrow scope of the exception but, rather, because, in 2002, two snipers had terrorized the District of Columbia and surrounding areas. One of the snipers allegedly stole a Bushmaster XM-15 semiautomatic rifle identical or similar to the one at issue in the present case from a gun dealer with a history of lax inventory control procedures.[62] In 2003, the families of the victims of the sniper attacks brought a civil action against the gun dealer that ultimately resulted in a $2.5 million settlement.[63] During the legislative debates,

many of the members who spoke in opposition to the bill that ultimately became PLCAA argued that the bill would have prevented victims of the sniper attacks from bringing an action against that gun dealer, even though the dealer's carelessness had allowed the snipers to obtain the assault weapon.[64] Indeed, it was in part for that very reason, and the public outcry over the sniper attacks, that prior versions of the bill failed to pass.[65]

To deflect these potent political attacks, the author and other supporters of the 2005 incarnation of the bill pointed to the recently added record keeping and illegal buyer exception language as evidence that victims of the sniper attacks would not have been barred from pursuing their action under the predicate exception.[66] Indeed, several legislators strongly suggested that these examples of predicate statutes were specifically added to PLCAA to make clear that the lawsuits arising from the sniper attacks would not have been barred by PLCAA.[67]

The most reasonable interpretation of this legislative history, then, is that the record keeping and unlawful buyer illustrations were included in the final version of PLCAA not in an effort to define, clarify, or narrow the universe of laws that qualify as predicate statutes but, rather, simply to stave off the politically potent attack that PLCAA would have barred lawsuits like the one that had arisen from the widely reported Beltway sniper attacks. There is no other plausible explanation for why Congress chose to modify the predicate exception language contained in the 2001 and 2003 bills, which otherwise was "virtually identical" to the language in PLCAA. 151 Cong. Rec. 2561 (2005), remarks of Senator Larry Edwin Craig; see also id., 18,096, remarks of Senator Craig (indicating that bill is same for all intents and purposes as version introduced during 108th Congress, with addition of clarifying examples).

This conclusion is bolstered by the fact that Congress was fully aware that there are many types of federal statutes and regulations, filling "hundreds of pages," that specifically govern the firearms industry. 151 Cong. Rec. 18,059 (2005), remarks of Senator Thomas Allen Coburn. Indeed, 18 U.S.C. § 922 is dedicated to delineating dozens of different unlawful acts relating to the production, distribution, and sale of firearms. Congress could have simply identified 18 U.S.C. § 922, or the other federal firearms laws to which Senator Coburn alluded, as examples of predicate statutes. Instead, the author of PLCAA opted to highlight only the two specific subsections of 18 U.S.C. § 922—subsection (g) and (n)—that would have barred the Beltway snipers from obtaining the weapon used in the shootings.

Under similar circumstances, when it is clear that examples have been included in a statute for purposes of emphasis or in response to recent, high profile events, rather than to restrict the scope of coverage, both the

United States Supreme Court and the lower federal courts have declined to apply canons, including ejusdem generis, to construe a statutory provision overly narrowly.[68] For similar reasons, we conclude that the ejusdem generis canon is not applicable to the predicate exception.

### c

### Statutory Exceptions To Be Construed Narrowly

Citing *Commissioner of Internal Revenue* v. *Clark*, 489 U.S. 726, 739, 109 S. Ct. 1455, 103 L. Ed. 2d 753 (1989), the defendants rely on another canon, contending that the predicate exception, like other statutory exceptions, must be construed narrowly to pre-serve the primary purpose of PLCAA. As we explained, however, our review of the statutory language strongly suggests that the defendants have misperceived the primary purpose of PLCAA, which is not to shield firearms sellers from liability for wrongful or illegal conduct. If Congress had intended to supersede state actions of this sort, it was required to make that purpose clear.[69]

### 2

### Related Legislation

We also find it instructive that, in early 2005, at approximately the same time that the proposed legislation that ultimately became PLCAA was introduced, bills were introduced in both the House of Representatives and the Senate that would have bestowed PLCAA-type immunity on fast food restaurant companies to protect them from lawsuits seeking to hold them liable for consumers' obesity and related health problems.[70] Both bills contained language that was substantially similar to PLCAA's predicate exception: "A qualified civil liability action shall not include . . . an action based on allegations that . . . a manufacturer or seller of [food] knowingly violated a Federal or State statute applicable to the marketing, advertisement, or labeling of [food] with intent for a person to rely on that violation . . . ." S. 908, 109th Cong. § 4 (2005); accord H.R. 554, 109th Cong. § 4 (2005). The House Report accompanying H.R. 554 made clear that "applicable" statutes for purposes of that bill were not limited to laws, such as the Federal Food, Drug and Cosmetic Act; 21 U.S.C. § 301 et seq. (2012); that directly and specifically regulate the food industry. Rather, the report indicated that state consumer protection laws, such as CUTPA, also qualified as predicate statutes, even though they are laws of general applicability that do not expressly address food and beverage marketing or labeling: "Every state has its own deceptive trade practices laws, and a knowing violation of any of such state laws could allow suits to go forward under the legislation if the criteria specified . . . are met."[71] H.R. Rep. No. 109-130, p. 8 (2005).

We recognize that these bills never became law and also that food and firearms are different types of products that implicate different risks and concerns. Nevertheless, we cannot ignore the fact that PLCAA and the fast food bills were introduced at essentially the same time, with substantially similar language and structure.[72] See 2B N. Singer & J. Singer, Statutes and Statutory Construction (7th Ed. 2012) § 51:4, pp. 275–76 (vetoed bills and repealed statutes may be construed in pari materia to assist in interpreting ambiguous legislation). In light of this fact, there is good reason to believe that legislators would have understood the term "statute applicable to" in 15 U.S.C. § 7903 (5) (A) (iii) as similarly encompassing an action under CUTPA against a company that unethically markets firearms for illegal purposes.

3

The Legislative History of PLCAA

Finally, to the extent that any ambiguities remain unresolved, we consider the legislative history of PLCAA. Although the extensive history of the statute presents something of a mixed bag, our review persuades us that Congress did not intend to limit the scope of the predicate exception to violations of firearms specific laws or to confer immunity from all claims alleging that firearms sellers violated unfair trade practice laws.

During the legislative debates, opponents of the proposed legislation that became PLCAA repeatedly questioned why it was necessary to confer immunity on the firearms industry when, in their view, only a very small number of gun violence related lawsuits had been filed against firearms manufacturers and distributors, most of which had been dismissed at the trial court level.[73] In response, PLCAA's sponsor and several of PLCAA's cosponsors described the specific types of lawsuits that the legislation was intended to prohibit. See footnotes 74 and 76 of this opinion. They emphasized that their primary concern was not with lawsuits such as the present action, in which individual plaintiffs who have been harmed in a specific incident of gun violence seek to hold the sellers responsible for their specific misconduct in selling the weapons involved. See id. Many proponents indicated that their intent was to preclude the rising number of instances in which municipalities and "anti-gun activists" filed "junk" or "frivolous" lawsuits targeting the entire firearms industry.[74] As one cosponsor of the legislation explained, "[t]his bill is only intended to protect law-abiding members of the firearms industry from nuisance suits that have no basis in current law, that are only intended to regulate the industry or harass the industry or put it out of business . . . which are [not] appropriate purposes for a lawsuit."[75] 151 Cong. Rec. 18,104 (2005), remarks of Senator

Max Sieben Baucus.[76] In the present action, by contrast, the private victims of one specific incident of gun violence seek compensation from the producers and distributors of a single firearm on the basis of alleged misconduct in the specific marketing of that firearm. Few if any of the bill's sponsors indicated that cases of this sort were what PLCAA was intended to preclude.

In addition, during the course of the legislative debates, many legislators either expressly stated or clearly implied that the only actions that would be barred by PLCAA would be ones in which a defendant bore absolutely no responsibility or blame for a plaintiff's injuries and was, in essence, being held strictly liable for crimes committed with firearms that it had merely produced or distributed. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1159 (Berzon, J., concurring in part and dissenting in part). One cosponsor, for example, emphasized that "the heart of this bill" was that one can be held liable for violating a statute during the production, distribution, or sale of firearms, "[b]ut we are not going to extend it to a concept where you are responsible, *after you have done everything right*, for what somebody else may do who bought your product and they did it wrong and it is their fault, not yours." (Emphasis added.) 151 Cong. Rec. 18,920 (2005), remarks of Senator Lindsey O. Graham. Another cosponsor explained the essential evil to which the bill was directed: "It is out of that fear and concern that we have mayors and cities passing laws that create strict liability . . . . [Firearms sellers have] become . . . insurer[s] against criminal activity by criminals." Id., 18,924, remarks of Senator Jefferson Beauregard Sessions III. Senator Sessions added: "That is what we are trying to curtail here—this utilization of the legal system . . . ." Id.

A common theme running through supporters' statements was that holding a firearms seller liable for third-party gun violence for which the seller is wholly blameless is no different from holding producers of products such as automobiles, matches, baseball bats, and knives strictly liable when those ubiquitous but potentially dangerous items are inappropriately or illegally used to commit crimes. As the author of PLCAA, Senator Craig, explained: "If a gun manufacturer is held liable for the harm done by a criminal who misuses a gun, then there is nothing to stop the manufacturers of any product used in crimes from having to bear the costs resulting from the actions of those criminals. So as I mentioned earlier, automobile manufacturers will have to take the blame for the death of a bystander who gets in the way of the drunk driver. The local hardware store will have to be held responsible for a kitchen knife it sold, if later that knife is used in the commission of a rape. The baseball team whose bat was used to bludgeon a victim will have to pay the cost of the crime. The list goes on and on." Id., 18,085. The implication of this argument

is that legislators' primary concern was that liability should not be imposed in situations in which the producer or distributor of a consumer product bears absolutely no responsibility for the misuse of that product in the commission of a crime. There is no indication that the sponsors of PLCAA believed that sellers of those consumer products should be shielded from liability if, for example, an automobile manufacturer advertised that the safety features of its vehicles made them ideally suited for drunk driving, or if a sporting goods dealer ran advertisements encouraging high school baseball players to hurl their bats at the opposing pitcher in retaliation for an errant pitch. That is, in essence, what the plaintiffs have alleged in the present case.

To the extent that supporters of PLCAA were concerned with lawsuits other than those seeking to hold firearms sellers strictly liable for gun violence, they consistently expressed that their intention was to foreclose novel legal theories that had been developed by anti-gun activists with the goal of putting firearms sellers out of business.[77] The author of the legislation explained as follows: "As we have stressed repeatedly, this legislation will not bar the courthouse doors to victims who have been harmed by the negligence or misdeeds of anyone in the gun industry. Well recognized causes of action are protected by the bill. Plaintiffs can still argue their cases for violations of law . . . . The only lawsuits this legislation seeks to prevent are novel causes of action that have no history or grounding in legal principle." Id., 18,096, remarks of Senator Craig. In addition, a number of lawmakers emphasized that the legislation was primarily directed at heading off unprecedented *tort* theories,[78] which explains why the predicate exception expressly preserved liability for statutory violations. See *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1135 ("Congress clearly intended to preempt common-law claims, such as general tort theories of liability"); id., 1160–61 (Berzon, J., concurring in part and dissenting in part) ("[PLCAA] was viewed essentially as a [tort reform] measure, aimed at restraining the supposed expansion of tort liability").

As we discussed previously, the plaintiffs' theory of liability is not novel; nor does it sound in tort.[79] The plaintiffs allege that the defendants engaged in unfair trade practices in violation of CUTPA, a statute that was enacted in 1973. See P.A. 73-615. Furthermore, CUTPA, by its express terms, is modeled on the FTC Act; see General Statutes § 42-110b (b); which has been in effect for more than one century. See Act of September 26, 1914, Pub. L. No. 63-203, 38 Stat. 717. As we explained, the FTC Act and its state counterparts have long been used to regulate not only the sale and marketing of firearms but also claims that sellers of other dangerous products have advertised their wares in a manner that modeled or promoted unsafe behavior and

created an unreasonable risk that viewers would engage in unsafe or illegal conduct.[80]

The defendants, purporting to rely on the decision of the Ninth Circuit in *Ileto*, argue that the legislative history of PLCAA supports a more restrictive view of the scope of the predicate exception. We read *Ileto* differently. As we noted; see footnote 47 of this opinion; the court in that case concluded that "congressional speakers' statements concerning the scope of . . . PLCAA reflected the understanding that manufacturers and sellers of firearms would be liable only for statutory violations concerning firearm[s] regulations *or sales and marketing regulations*." (Emphasis added.) *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1137. Because CUTPA specifically regulates commercial sales and marketing activities such as those at issue in the present case; see, e.g., *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 178 (D. Conn. 2000); it falls squarely within the predicate exception, as *Ileto* construed the legislative history.

We do not dispute that, over the course of the hundreds of pages of coverage of the legislative debates, a few congressional supporters of PLCAA made a few brief references to predicate statutes as being firearms specific.[81] What the defendants have overlooked, however, are the dozens of statements by PLCAA's drafter and cosponsors that imply or directly state that the predicate exception applies far more broadly, such that firearms companies may be held liable for violation of *any* applicable law, and not only those laws that specifically govern the firearms trade. Indeed, in the vast majority of instances in which the predicate exception was discussed during the legislative debates, proponents spoke in broad, general terms, indicating that the bill would not immunize firearms companies that had engaged in *any* illegal activity.[82]

Several cosponsors of the bill that became PLCAA specifically explained that it would not preclude victims of gun violence from holding firearms companies accountable for injuries resulting from their gross negligence or reckless conduct, because, essentially, any such conduct would be in violation of some state or federal law. See, e.g., 151 Cong. Rec. 18,919 (2005), remarks of Senator Jon Llewellyn Kyl ("[M]ost of the acts that would meet the definition of gross negligence would already be in violation of law. And if they are in violation of law, they are not exempted from this legislation. We don't try to exempt any gun manufacturer for conduct [that] is in violation of law. So by definition that would be an exemption from the provisions of the bill . . . . The bottom line here is that if there really is a problem, that is to say, the conduct is so bad that it is a violation of law, no lawsuit is precluded under our bill in any way. . . . So in fact if the gross negligence or reckless conduct of a person was

the proximate cause of death or injury—that is the allegation—you are in court irrespective of this bill . . . ."); id., 18,922, remarks of Senator Orrin Grant Hatch ("[v]irtually any act that would meet the definition of gross negligence . . . would already be a violation of [f]ederal, [s]tate or local law, and therefore would not receive the protection of this law anyway"). The clear implication of these comments is that the predicate exception extends beyond firearms specific laws and encompasses laws such as CUTPA, which prohibit wholly irresponsible conduct such as the wrongful advertising of potentially dangerous products for criminal or illegal purposes.

The strongest support for the defendants' reading of the legislative history is a passing statement by the author of PLCAA, Senator Craig, that "[t]his bill does not shield . . . [those who] have violated existing law . . . and I am referring to the [f]ederal firearms laws . . . ." Id., 18,085. That statement was made, however, in the context of a discussion of the federal record keeping requirements that govern sales of firearms, requirements that are indisputably specific to that industry. At no point did Senator Craig suggest that, in his opinion, the only *state* laws that qualify as predicate statutes are those that specifically regulate the firearms industry. Rather, on numerous occasions during the legislative debates, Senator Craig categorically stated that the bill was intended to protect only law abiding firearms companies that had not violated *any* federal or state law.[83] "As we have stressed repeatedly," Senator Craig emphasized, "this legislation will not bar the courthouse doors to victims who have been harmed by the negligence or misdeeds of anyone in the gun industry. Well recognized causes of action are protected by the bill. Plaintiffs can still argue their cases for violations of law . . . ."[84] Id., 18,096. Accordingly, we conclude that the legislative history of PLCAA does not support the defendants' contention that Congress intended to shield them from potential liability for the types of CUTPA violations that the plaintiffs have alleged.

VI

CONCLUSION

It is, of course, possible that Congress intended to broadly immunize firearms sellers from liability for the sort of egregious misconduct that the plaintiffs have alleged but failed to effectively express that intent in the language of PLCAA or during the legislative hearings. If that is the case, and in light of the difficulties that the federal courts have faced in attempting to distill a clear rule or guiding principle from the predicate exception, Congress may wish to revisit the issue and clarify its intentions.

We are confident, however, that, if there were credi-

ble allegations that a firearms seller had run explicit advertisements depicting and glorifying school shootings, and promoted its products in video games, such as "School Shooting," that glorify and reward such unlawful conduct,[85] and if a troubled young man who watched those advertisements and played those games were inspired thereby to commit a terrible crime like the ones involved in the Sandy Hook massacre, then even the most ardent sponsors of PLCAA would not have wanted to bar a consumer protection lawsuit seeking to hold the supplier accountable for the injuries wrought by such unscrupulous marketing practices. That is not this case, and yet the underlying legal principles are no different. Once we accept the premise that Congress did not intend to immunize firearms suppliers who engage in truly unethical and irresponsible marketing practices promoting criminal conduct, and given that statutes such as CUTPA are the only means available to address those types of wrongs, it falls to a jury to decide whether the promotional schemes alleged in the present case rise to the level of illegal trade practices and whether fault for the tragedy can be laid at their feet.

For the foregoing reasons, we conclude that the trial court properly determined that, although most of the plaintiffs' claims should have been dismissed, PLCAA does not bar the plaintiffs' wrongful marketing claims and that, at least to the extent that it prohibits the unethical advertising of dangerous products for illegal purposes, CUTPA qualifies as a predicate statute. Specifically, if the defendants did indeed seek to expand the market for their assault weapons through advertising campaigns that encouraged consumers to use the weapons not for legal purposes such as self-defense, hunting, collecting, or target practice, but to launch offensive assaults against their perceived enemies, then we are aware of nothing in the text or legislative history of PLCAA to indicate that Congress intended to shield the defendants from liability for the tragedy that resulted.

The judgment is reversed with respect to the trial court's ruling that the plaintiffs lack standing to bring a CUTPA claim and its conclusion that the plaintiffs' wrongful death claims predicated on the theory that any sale of military style assault weapons to the civilian market represents an unfair trade practice were not barred under the applicable statute of limitations, and the case is remanded for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion McDONALD, MULLINS and KAHN, Js., concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Justices Palmer, McDonald, Robinson, Mullins, Kahn, Vertefeuille and Elgo. Although Justices Robinson and Kahn were not present when the case was argued before the court, they have read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

The listing of justices reflects their seniority status on this court as of date of oral argument.

[1] Following the Sandy Hook massacre, the legislature added the Bushmaster XM15, among many other assault rifles, to the list of firearms the sale or transfer of which is prohibited in Connecticut. See Public Acts 2013, No. 13-3, § 25, codified at General Statutes (2014 Supp.) § 53-202a (1) (B) (xxi).

[2] The plaintiffs are Donna L. Soto, administratrix of the estate of Victoria L. Soto; Ian Hockley and Nicole Hockley, coadministrators of the estate of Dylan C. Hockley; David C. Wheeler, administrator of the estate of Benjamin A. Wheeler; Mary D'Avino, administratrix of the estate of Rachel M. D'Avino; Mark Barden and Jacqueline Barden, coadministrators of the estate of Daniel G. Barden; William D. Sherlach, executor of the estate of Mary Joy Sherlach; Neil Heslin and Scarlett Lewis, coadministrators of the estate of Jesse McCord Lewis; Leonard Pozner, administrator of the estate of Noah S. Pozner; and Gilles J. Rousseau, administrator of the estate of Lauren G. Rousseau. For convenience, we refer to these plaintiffs simply as "the decedents" with respect to claims brought by the administrators in their fiduciary capacity.

We note that one administrator, William D. Sherlach, also filed suit in his individual capacity, seeking damages for loss of consortium. The parties have not specifically briefed and we do not separately address William D. Sherlach's loss of consortium claims in this opinion.

We further note that Natalie Hammond, a staff member who was wounded in but survived the attack, also was named as a plaintiff. Hammond has abandoned her claims and, therefore, is not a party to this appeal.

[3] The Bushmaster defendants are Bushmaster Firearms; Bushmaster Firearms, Inc.; Bushmaster Firearms International, LLC; Remington Outdoor Company, Inc.; Remington Arms Company, LLC; Bushmaster Holdings, LLC; and Freedom Group, Inc.

[4] The Camfour defendants are Camfour, Inc., and Camfour Holding, LLP, also known as Camfour Holding, Inc.

[5] The Riverview defendants are Riverview Sales, Inc., and David LaGuercia.

[6] We will refer to Adam Lanza as Lanza and to Nancy Lanza as his mother.

[7] General Statutes § 52-555 provides in relevant part: "(a) In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses, provided no action shall be brought to recover such damages and disbursements but within two years from the date of death, and except that no such action may be brought more than five years from the date of the act or omission complained of. . . ."

[8] The parties and the amici disagree as to whether the term "assault rifle" is an appropriate moniker for this class of weapons. We use the term because it is how the General Assembly has chosen to refer to semiautomatic firearms. See General Statutes § 53-202a (1) (B) (xxi); see also *Merrill* v. *Navegar, Inc.*, 26 Cal. 4th 465, 470 n.3, 28 P.3d 116, 110 Cal. Rptr. 2d 370 (2001) (term has become widely accepted in law).

[9] General Statutes § 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Other relevant provisions of CUTPA are set forth in part IV of this opinion.

[10] The referenced statutory provisions are set forth in part IV of this opinion.

[11] See 15 U.S.C. § 7903 (5) (A) (ii) (2012).

[12] See 15 U.S.C. § 7903 (5) (A) (iii) (2012). This exception has come to be known as the predicate exception because a plaintiff must allege a knowing violation of a predicate statute.

[13] The plaintiffs appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

We granted permission to thirteen groups to appear and file amicus curiae briefs in this appeal. Five of the amici have filed briefs in support of the defendants' position: (1) Connecticut Citizens Defense League, Inc.; (2) Connecticut Defense Lawyers Association; (3) Gun Owners of America, Inc., Gun Owners Foundation, United States Justice Foundation, The Heller Foundation, and Conservative Legal Defense and Education Fund; (4) National Rifle Association of America, Inc.; and (5) National Shooting Sports Foundation. Eight of the amici have filed briefs in support of the plaintiffs' position: (1) medical doctors Katie Bakes, William Begg, Barbara Blok, Kathleen Clem, Christopher Colwell, Marie Crandall, Michael Hirsh, Stacy Reynolds, Jeffrey Sankoff, and Comilla Sasson (physicians amici); (2) The Brady Center to Prevent Gun Violence; (3) CT Against Gun Violence and Tom Diaz; (4) Law Center to Prevent Gun Violence; (5) Newtown Action Alliance and the Connecticut Association of Public School Superintendents; (6) law professors Nora Freeman Engstrom, Alexandra D. Lahav, Anita Bernstein, John J. Donohue III, Michael D. Green, Gregory C. Keating, James Kwak, Douglas Kysar, Stephan Landsman, Anthony J. Sebok, W. Bradley Wendel, John Fabian Witt, and Adam Zimmerman; (7) the State of Connecti-

cut and the Department of Consumer Protection; and (8) Trinity Church Wall Street.

[14] Although our conclusion that the plaintiffs' primary theory—that the legal sale of the AR-15 assault rifle to the civilian market constitutes an unfair trade practice—is barred by the relevant statute of limitations disposes of that theory; see part IV B of this opinion; we believe that that theory, if timely presented, also would be barred by PLCAA immunity and/or the Product Liability Act, General Statutes § 52-572n (a).

[15] The standard of review regarding motions to strike is well established. "A motion to strike attacks the legal sufficiency of the allegations in a pleading. . . . In reviewing the sufficiency of the allegations in a complaint, courts are to assume the truth of the facts pleaded therein, and to determine whether those facts establish a valid cause of action. . . . [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. . . . Because a motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court, our review of the court's ruling [on a motion to strike] is plenary." (Citations omitted; internal quotation marks omitted.) *Himmelstein* v. *Windsor*, 304 Conn. 298, 307, 39 A.3d 1065 (2012).

[16] Although the plaintiffs do not specifically allege it, an investigation revealed that Lanza killed his mother in their home prior to the massacre and that the massacre ended when he took his own life in the school. Both of those killings apparently were carried out with other firearms and are not at issue in this case. See Division of Criminal Justice, State of Connecticut, Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012 (November 25, 2013) p. 2.

[17] In addition to alleging that the defendants promoted the XM15-E2S for illegal, offensive use by civilians, the plaintiffs contended in their briefs and at oral argument before this court that the defendants' marketing was unethical and unscrupulous insofar as they (1) marketed the weapon to unstable, or even mentally ill, teenaged boys who were likely to use the rifle to commit violent assaults, (2) attempted to circumvent firearms sales laws by marketing the weapon to legal buyers who would foreseeably provide them to family members who could not legally purchase such weapons, and (3) further promoted the weapons for offensive use by unstable young men by licensing them for placement in violent video games that promote illegal civilian uses of military type assault rifles. Because these legal theories are not clearly articulated in the operative complaint, however, we do not consider them for purposes of this opinion.

[18] Although the plaintiffs do not expressly allege it in their complaint, the physicians amici contend that, according to the medical literature, assault weapon advertisements may activate people who are predisposed to violence.

[19] Title 15 of the 2012 edition of the United States Code, § 7903 (5) (B), provides in relevant part: "[T]he term 'negligent entrustment' means the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others."

[20] Title 15 of the 2012 edition of the United States Code, § 7903 (5) (A), provides in relevant part: "The term 'qualified civil liability action' . . . shall not include—

* * *

"(ii) an action brought against a seller for negligent entrustment . . . ."

[21] As we explain hereinafter, there is, of course, a third option: it may be foreseeable that the direct entrustee will share the dangerous item with a specific, identifiable third party who is incompetent to use it safely. The present case does not require us to determine whether and when an action for negligent entrustment will lie under those circumstances, when the nexus between the entrustor and the ultimate user is less attenuated than it is in the present case.

[22] See, e.g., The Republic of Plato (H. Davis trans., M. Walter Dunne 1901) c. 5, p. 33 (arguing that, having taken temporary possession of weapons from friend who was then in his right mind, it would be unjust to return those weapons if friend, having since gone mad, demanded them back).

[23] The plaintiffs expressly disclaim any allegation that Riverview's employees were careless in their decision to sell the rifle to Lanza's mother.

[24] See, e.g., *Dillon* v. *Suburban Motors, Inc.*, 212 Cal. Rptr. 360, 362–67 (Cal. App.), cause dismissed, 705 P.2d 1260, 218 Cal. Rptr. 584 (Cal. 1985); *Semeniuk* v. *Chentis*, 1 Ill. App. 2d 508, 510, 117 N.E.2d 883 (1954); *Sickles* v. *Montgomery Ward & Co.*, 6 Misc. 2d 1000, 1001, 167 N.Y.S.2d 977 (1957); *Corey* v. *Kaufman & Chernick, Inc.*, 70 R.I. 27, 30–31, 36 A.2d 103 (1944).

[25] The plaintiffs have drawn our attention to several cases in which the dangerous instrumentality at issue was misused by someone other than the direct entrustee. In each of those cases, however, the defendants had specific reason to know or believe that the direct entrustee should not be trusted with the instrumentality. See, e.g., *Collins* v. *Arkansas Cement Co.*, 453 F.2d 512, 513–14 (8th Cir. 1972) (defendant's employee who gave explosive to children had history of horseplay with such explosives); *LeClaire* v. *Commercial Siding & Maintenance Co.*, 308 Ark. 580, 581–82, 826 S.W.2d 247 (1992) (defendant knew that employee, who allowed another driver to use defendant's vehicle, leading to accident, had history of intoxication and moving violations); *Rios* v. *Smith*, 95 N.Y.2d 647, 653, 744 N.E.2d 1156, 722 N.Y.S.2d 220 (2001) (defendant knew that son often drove defendant's all-terrain vehicle [ATV] in unsafe manner and that son's friend, whose misuse of ATV injured plaintiff, was frequent visitor and previously had ridden ATV with son).

[26] General Statutes (Rev. to 1975) § 42-110b (a) provided in relevant part: "No person shall engage in unfair methods of competition . . . in the conduct of any trade or commerce. . . ." General Statutes (Rev. to 1975) § 42-110a (4) defined "trade and commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property . . . ."

[27] See, e.g., 19 H.R. Proc., Pt. 6, 1976 Sess., pp. 2186–87, remarks of Representative Ferrari.

[28] See, e.g., 22 S. Proc., Pt. 8, 1979 Sess., p. 2575, remarks of Senator Steven C. Casey; 19 S. Proc., Pt. 6, 1976 Sess., pp. 2276–78, remarks of Senator Louis Ciccarello.

[29] See, e.g., *Bubalo* v. *Navegar, Inc.*, Docket No. 96 C 3664, 1997 WL 337218, *9 (N.D. Ill. June 13, 1997), modified on other grounds, 1998 WL 142359 (N.D. Ill. March 20, 1998); S. Calkins, "FTC Unfairness: An Essay," 46 Wayne L. Rev. 1935, 1975–76 n.182 (2000); T. Lytton, "*Halberstam* v. *Daniel* and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers," 64 Brook. L. Rev. 681, 704–705 (1998).

[30] We note that other courts and commentators have deemed this to be a plausible theory of causation. See *Friedman* v. *Highland Park*, 784 F.3d 406, 411 (7th Cir.) (ban on assault weapons and large capacity magazines may reduce carnage if mass shooting occurs), cert. denied,        U.S.       , 136 S. Ct. 447, 193 L. Ed. 2d 483 (2015); *Merrill* v. *Navegar, Inc.*, supra, 26 Cal. 4th 517 (Werdegar, J., dissenting) (reasonable juror could find that features of assault pistol allowed shooter to kill and injure more victims than would have been possible with conventional weapons); T. Lytton, "*Halberstam* v. *Daniel* and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers," 64 Brook. L. Rev. 681, 706 (1998) ("[i]f plaintiffs can somehow prove that a defendant's marketing efforts create a new market among individuals known to be likely to engage in criminal activity who, but for the defendant's efforts, would be less likely to purchase a weapon . . . with the firepower of the defendant's, then [those] plaintiffs may be able to convince a jury on the issues of breach and causation").

[31] General Statutes § 42-110g (f) provides: "An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."

[32] Of course, on remand the defendants are not foreclosed from attempting to demonstrate, in the context of a motion for summary judgment, that they did not engage in any of the allegedly wrongful marketing activities within three years prior to the date of the massacre.

[33] We note that, although a " '[p]roduct liability claim' includes all claims or actions brought for personal injury, death or property damage caused by [among other things] the . . . marketing . . . of any product"; General Statutes § 52-572m (b); it is well established that the exclusivity provision of the Product Liability Act applies only to those claims seeking to recover damages caused by a *defective* product. *Gerrity* v. *R.J. Reynolds Tobacco Co.*, supra, 263 Conn. 128.

[34] Although the defendants frame the issue as whether damages for wrongful death are recoverable under CUTPA, the issue is more accurately characterized as whether CUTPA permits recovery for personal injuries, fatal or otherwise. Because death itself was not a recognized type of damage at

common law, "[d]eath and its direct consequences can constitute recoverable elements of damages only if, and to the extent that, they are made so by statute." *Lynn* v. *Haybuster Mfg., Inc.*, 226 Conn. 282, 295, 627 A.2d 1288 (1993). In fact, "[t]he wrongful death statute . . . is the sole basis [on] which an action that includes as an element of damages a person's death or its consequences can be brought." (Citation omitted.) Id. There is no question, then, that CUTPA itself does not authorize the recovery of damages for wrongful death.

[35] We express no opinion as to under what other circumstances CUTPA may allow recovery for personal injuries.

[36] See R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2018–19 Ed.) § 6.7, p. 850 (noting that Connecticut's trial courts are divided on this question).

[37] General Statutes § 42-110b (b) provides in relevant part that "[i]t is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act . . . ."

[38] We recognize that the FTC Act does not authorize a private right of action and, therefore, that neither the FTC nor the federal courts, in construing the FTC Act, have confronted the issue of whether a plaintiff harmed by immoral marketing practices may recover for resulting personal injuries. Nevertheless, we find it instructive that the FTC Act has been construed to apply to unethical and unscrupulous marketing and other unfair trade practices that are likely to result in primarily physical harms. See, e.g., *In re International Harvester Co.*, supra, 104 F.T.C. 1064.

[39] The statute applies to sales of both firearms and ammunition. See, e.g., 15 U.S.C. § 7903 (4) (2012). In the interest of simplicity, we use the term "firearm" to encompass ammunition as well.

[40] The law provides that "[a] qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. § 7902 (a) (2012). "The term 'qualified civil liability action' means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a [firearm], or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a [firearm] by the person or a third party . . . ." 15 U.S.C. § 7903 (5) (A) (2012).

[41] See, e.g., 15 U.S.C. § 6211 (9) (2012) (for purposes of international antitrust enforcement assistance, defining "regional economic integration organization" as "an organization that is constituted by, and composed of, foreign states, and on which such foreign states have conferred sovereign authority to make decisions that are . . . directly applicable to and binding on persons within such foreign states"); 22 U.S.C. § 283ii (a) (2012) ("securities guaranteed by the [Inter-American Investment] Corporation as to both principal and interest to which the commitment in article II, section 2 (e) of the agreement [establishing that Corporation] is expressly applicable," are exempt from rules governing domestic securities); 26 U.S.C. § 833 (c) (4) (B) (i) (2012) (health insurance organization is treated as existing Blue Cross or Blue Shield organization for tax purposes if it is "organized under, and governed by, State laws which are specifically and exclusively applicable to not-for-profit health insurance or health service type organizations").

[42] We recognize that the term "marketing" is facially ambiguous. One dictionary in print at the time the statute was enacted defines "marketing" as follows: "1. The act or process of buying and selling in a market. 2. The commercial functions involved in transferring goods from producer to consumer. 3. The promotion of sales of a product, as by advertising and packaging." The American Heritage College Dictionary (4th Ed. 2007) p. 847. Notably, whereas the first two definitions are roughly synonymous with the general concepts of distribution and sales, the third is limited to advertising and other purely promotional functions.

In context, however, it is clear that the term "marketing" is used in PLCAA in the third, narrower sense. As we noted, the predicate exception refers to statutes "applicable to the sale or marketing of" firearms. 15 U.S.C. § 7903 (5) (A) (iii) (2012). Elsewhere, PLCAA refers to "[b]usinesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products . . . ." 15 U.S.C. § 7901 (a) (5) (2012). If the term "marketing" had been meant to encompass sales and distribution, as well as advertising and the like, then Congress' inclusion of the terms "sale" and "distribution" would be superfluous. See, e.g., *Milner* v. *Dept. of the Navy*, 562 U.S. 562, 575, 131 S. Ct. 1259, 179 L. Ed. 2d 268 (2011) (citing *TRW, Inc.* v. *Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 151 L.

Ed. 2d 339 [2001], for proposition that statutes should be read to avoid making any provision superfluous).

In addition, there are several other provisions of the statute in which the drafters referred to the "sale" and "distribution" of firearms but did not mention "marketing." See, e.g., 15 U.S.C. § 7901 (a) (4) (2012); 15 U.S.C. § 7903 (1) (2012). We must assume that the drafters selected their language with conscious intent, and that the use of the additional term "marketing" in the predicate exception is meant to import a distinct meaning. See, e.g., *Russello* v. *United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983).

Our conclusion that the meaning of the term "marketing" is limited to advertising and promotional functions in the context of PLCAA finds additional support in the 2018 edition of 22 C.F.R. § 123.4 (a) (3), which permits the temporary importation of certain defense articles, including arms, if an item "[i]s imported for the purpose of exhibition, demonstration or marketing in the United States and is subsequently returned to the country from which it was imported . . . ." This is consistent with the more restrictive definition of "marketing" in other federal regulations. See, e.g., 45 C.F.R. § 164.501 (2018). Several recently proposed federal bills that would have regulated the firearms industry provide further support. H.R. 5093, 113th Cong. (2014), for example, which would have directed the FTC to "promulgate rules . . . to prohibit any person from marketing firearms to children"; id., § 2 (a); barred advertising practices such as "the use of cartoon characters to promote firearms and firearms products." Id., § 2 (a) (1). Also instructive is H.R. 2089, 115th Cong. (2017). One provision of that bill would have prohibited "the manufacture, importation, sale, or purchase by civilians of the Five-seveN Pistol . . . ." Id., § 2 (b) (2). Another provision references "the current or historical marketing of the firearm's capabilities . . . ." Id., § 3 (b).

[43] See Cal. Bus. & Prof. Code § 5272.1 (c) (2) (Deering Supp. 2018) (prohibiting firearms advertisements at public, multimodal transit facilities); N.J. Admin. Code § 13:54-5.6 (2007) (establishing requirements for newspaper advertisements of machine guns, assault firearms, and semiautomatic rifles); R.I. Gen. Laws § 11-47-40 (b) (2002) (regulating advertisement of concealable firearms).

[44] Clearly, as one original cosponsor of the bill that became PLCAA; S. 397, 109th Cong. (2005); explained, legislators were of the view that such laws do exist: "[P]laintiffs are demanding colossal monetary damages and a broad range of injunctive relief . . . . These injunctions would relate to the design, manufacture, distribution, *marketing*, and the sale of firearms. *We already have laws that cover all of that*." (Emphasis added.) 151 Cong. Rec. 17,371 (2005), remarks of Senator Jefferson Beauregard Sessions III.

[45] See, e.g., R. Petty, "Supplanting Government Regulation with Competitor Lawsuits: The Case of Controlling False Advertising," 25 Ind. L. Rev. 351, 359 (1991); M. Meaden, Comment, "Joe Camel and the Targeting of Minors in Tobacco Advertising: Before and After *44 Liquormart* v. *Rhode Island*," 31 New Eng. L. Rev. 1011, 1026–27 (1997).

[46] The plaintiffs' CUTPA claim is predicated on their contention that the defendants "unethically, oppressively, immorally, and unscrupulously promoted" the XM15-E2S. Commonly known as the "cigarette rule," that standard originated in a policy statement of the Federal Trade Commission issued more than one-half century ago; see Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (July 2, 1964); and rose to prominence when mentioned in a footnote in *Federal Trade Commission* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972). The decades since have seen a move away from the cigarette rule at the federal level. See *Ulbrich* v. *Groth*, 310 Conn. 375, 474–77, 78 A.3d 76 (2013) (*Zarella, J.*, concurring in part and dissenting in part); 12 R. Langer et al., supra, § 2.2, pp. 39–45. That move culminated with a revision of the FTC Act by Congress in 1994, which codified the limitations on the FTC's authority to regulate unfair practices. See Federal Trade Commission Act Amendments of 1994, Pub. L. No. 103-312, § 9, 108 Stat. 1691, 1695, codified at 15 U.S.C. § 45 (n) (1994). This court has characterized the federal standard for unfair trade practices contained therein as "a more stringent test known as the substantial unjustified injury test," under which "an act or practice is unfair if it causes substantial injury, it is not outweighed by countervailing benefits to consumers or competition, and consumers themselves could not reasonably have avoided it." *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 622 n.13, 119 A.3d 1139 (2015).

The defendants have not asked us to reexamine our continued application of the cigarette rule as the standard governing unfair trade practice claims brought under CUTPA, and, therefore, the issue is not presently before us. We recognize, however, that a question exists as to whether the cigarette rule should remain the guiding rule as a matter of state law. See, e.g., id.,

("[i]n light of our conclusion . . . that the plaintiffs' CUTPA claim fails even under the more lenient cigarette rule, it is unnecessary for us to decide whether that rule should be abandoned in favor of the federal test"); *Ulbrich* v. *Groth*, supra, 310 Conn. 429 (declining to review "the defendants' unpreserved claim that the cigarette rule should be abandoned in favor of the substantial unjustified injury test"); *State* v. *Acordia, Inc.*, 310 Conn. 1, 29 n.8, 73 A.3d 711 (2013) (declining to "address the issue of the viability of the cigarette rule until it squarely has been presented"). At the same time, notwithstanding the questions raised in those decisions, we have continued to apply the cigarette rule as the law of Connecticut; see, e.g., *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 880, 124 A.3d 847 (2015); and, even though we have flagged the issue for reexamination by the legislature; see *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, supra, 317 Conn. 622 n.13; the legislature has continued to acquiesce in our application of the cigarette rule.

In any event, even if we were to adopt the current federal standard governing unfair advertising, it would not bar the plaintiffs' CUTPA claims, as they have alleged that the defendants engaged in trade practices that caused substantial, unavoidable injury and that were not outweighed by countervailing benefits. Still, on remand, the defendants are not foreclosed from arguing that a different standard should govern the plaintiffs' CUTPA claims.

[47] Although the Ninth Circuit construed the predicate exception more narrowly, that court also rejected a reading that would limit predicate statutes to those that pertain exclusively to the sale or marketing of firearms, recognizing that other statutes that regulate "sales and manufacturing activities" could qualify. *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1134; see also id., 1137 (legislative history indicates intent to restrict liability to "statutory violations concerning firearm[s] regulations *or sales and marketing regulations*" [emphasis added]). In *Ileto*, the Ninth Circuit held that the California laws at issue did not qualify as predicate statutes, but it reached that conclusion primarily because (1) California had codified its common law of tort, which remained subject to judicial evolution; id., 1135–36; and (2) during the legislative debates, members of Congress had referenced that very case as an example of one that PLCAA would preclude. Id., 1137. In other words, the fact the California statutes at issue were, in a sense, merely general tort theories masquerading as statutes meant that the plaintiffs' claims were precisely the sort that Congress intended to preempt.

[48] See *In re Colt Industries Operating Corp.*, 84 F.T.C. 58, 61–62 (1974); *In re Browning Arms Co.*, 80 F.T.C. 749, 752 (1972); *In re Ithaca Gun Co.*, 78 F.T.C. 1104, 1107–1108 (1971).

[49] In another Connecticut case, *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 313, the plaintiffs asserted CUTPA claims similar to those at issue in the present case, alleging, among other things, that misleading and unscrupulous firearms advertising contributed to gun violence. Id., 334–35. Because the municipal plaintiffs lacked standing, however, we did not rule on the validity of their CUTPA claims. See id., 343, 373.

A CUTPA violation also was alleged on the basis of conduct similar to that at issue in the present case in *Wilson* v. *Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002). In that case, the plaintiff's son had been stabbed to death by a friend who had become obsessed with a violent interactive video game. Id., 169. The plaintiff alleged, among other things, that the defendant manufacturer of that game violated CUTPA by aggressively and inappropriately marketing the game to a vulnerable adolescent audience. See id., 175–76. The court dismissed the CUTPA claim for failure to comply with CUTPA's statute of limitations. Id., 176. In *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 170–71 (D. Conn. 2000), by contrast, the court denied a motion to dismiss the plaintiff's claim that the defendant violated CUTPA by unethically marketing tobacco products to minors.

[50] See, e.g., *Melton* v. *Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1306 (S.D. Fla. 2017) (defective design action in which plaintiffs stated cognizable claim under Florida unfair trade practice law that, among other things, advertising falsely represented that AK-47 rifles are safe); *Beretta U.S.A. Corp.* v. *Federal Ins. Co.*, 117 F. Supp. 2d 489, 490, 492 (D. Md. 2000) (firearms manufacturer sought defense and indemnification in underlying state actions alleging, among other things, that manufacturer falsely advertised that gun ownership and possession increased one's security), aff'd, 17 Fed. Appx. 250 (4th Cir. 2001); *People* v. *Arcadia Machine & Tool, Inc.*, Docket No. 4095, 2003 WL 21184117, *15, 22, 26–27 (Cal. Super. April 10, 2003) (granting summary

judgment for defendant manufacturers because plaintiffs failed to present evidence that [1] reasonable consumers would be misled by defendants' advertisements, or [2] California public policy disapproved of marketing firearms to children, but allowing case to proceed against defendant distributors accused of advertising banned assault weapons), aff'd sub nom. *In re Firearm Cases*, 126 Cal. App. 4th 959, 992, 24 Cal. Rptr. 3d 659 (2005); Opinions, N.M. Atty. Gen. No. 77-23 (July 19, 1977) p. 149 (advertising illegal sale of firearms in liquor establishment would constitute unfair or deceptive trade practice); see also *FN Herstal, S.A.* v. *Clyde Armory, Inc.*, 123 F. Supp. 3d 1356, 1376 (M.D. Ga. 2015) (trademark infringement action), aff'd, 838 F.3d 1071 (11th Cir. 2016), cert. denied, U.S. , 137 S. Ct. 1436, 197 L. Ed. 2d 649 (2017); *American Shooting Sports Council, Inc.* v. *Attorney General*, 429 Mass. 871, 875, 711 N.E.2d 899 (1999) (attorney general may regulate firearms sales and marketing pursuant to state unfair trade practice law in order to address sale of products that do not perform as warranted, including those that pose safety and performance issues, as well as those that legislature has defined as unlawful).

[51] See, e.g., *In re MACE Security International, Inc.*, 117 F.T.C. 168, 169–72, 181–84 (1994) (advertisements made unsubstantiated claims that single, poorly directed spray of self-defense chemical would instantly stop assailants); *In re Benton & Bowles, Inc.*, 96 F.T.C. 619, 622–24 (1980) (advertisements depicting children riding bicycles unsafely or illegally); *In re AMF, Inc.*, supra, 95 F.T.C. 313–15 (advertisements representing young children riding bicycles and tricycles in improper, unsafe or unlawful manner); *In re Mego International, Inc.*, supra, 92 F.T.C. 189–90 (advertisements depicting children using electrical toys and appliances near water without adult supervision); *In re Uncle Ben's, Inc.*, supra, 89 F.T.C. 136 (advertisements depicting children attempting to cooking food without close adult supervision*); In re Hudson Pharmaceutical Corp.*, 89 F.T.C. 82, 86–89 (1977) (advertisements that might induce children to take excessive amounts of vitamin supplements); *In re General Foods Corp.*, 86 F.T.C. 831, 839–40 (1975) (advertisements depicting consumption of raw plants growing in wild or natural surroundings); but see J. Vernick et al., "Regulating Firearm Advertisements That Promise Home Protection: A Public Health Intervention," 277 JAMA 1391, 1396 (1997) (for unstated reasons, FTC did not act on request by various advocacy groups to adopt rules regulating firearm advertising).

[52] Since that time, the FTC also has taken an interest in the marketing of violent video games to children. See generally Federal Trade Commission, Report to Congress, supra, 2009 WL 5427633.

[53] As we previously noted; see footnote 47 of this opinion; although the Ninth Circuit has construed the predicate exception more narrowly than has the Second Circuit, CUTPA also might well qualify as a predicate statute under the standard articulated in the Ninth Circuit's decision in *Ileto*. Specifically, the court suggested that a predicate statute must either concern "firearm[s] regulations *or sales and marketing regulations*." (Emphasis added.) *Ileto* v. *Glock, Inc.*, 565 F.3d 1137; see also id., 1134 (statutory examples of predicate statutes "target the firearms industry specifically" or "pertain specifically to sales and manufacturing activities"). Accordingly, insofar as CUTPA specifically regulates commercial sales activities and is, therefore, narrower in scope and more directly applicable than the general tort and nuisance statutes at issue in *Ileto*, it arguably qualifies as a predicate statute under the standards articulated by each of the three appellate courts to have construed the federal statute.

[54] Title 15 of the 2012 edition of the United States Code, § 7901 (a) (5), provides: "Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended."

[55] The standards embodied in the cigarette rule have been established law—first federal, and then state—for nearly six decades. As one legal scholar has explained, "at one time challenges to the depiction of unsafe practices in advertisements [were] a staple of [FTC] unfairness enforcement . . . ." (Footnote omitted.) S. Calkins, supra, 46 Wayne L. Rev. 1974. Moreover, even under the current federal unfairness standard, one of the FTC's primary areas of focus in challenging unfair trade practices has been "advertising that promotes unsafe practices." Id., 1962. The plaintiffs merely seek to apply these established legal principles to the marketing of assault weapons,

products that are at least as dangerous as any that have been the subject of prior FTC enforcement actions.

During the legislative debates, the author of PLCAA made clear that all the law sought to preclude was novel causes of action, rather than specific applications of established legal principles: "Plaintiffs can still argue their cases for violations of law . . . . The only lawsuits this legislation seeks to prevent are novel causes of action that have no history or grounding in legal principle." 151 Cong. Rec. 18,096 (2005), remarks of Senator Larry Edwin Craig. In fact, the plaintiffs' claims invoke a statutory cause of action that falls squarely within established consumer protection law. See, e.g., *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 170–71, 178 (D. Conn. 2000) (denying motion to dismiss claim that defendant violated CUTPA by unethically and unscrupulously marketing cigarettes to underage smokers and encouraging minors to violate law).

[56] We further note that among the stated purposes of PLCAA was "[t]o protect the right, under the First Amendment to the Constitution, of manufacturers, distributors, dealers, and importers of firearms or ammunition products, and trade associations, to speak freely . . . ." 15 U.S.C. § 7901 (b) (5) (2012). We recognize that the advertisement and marketing of goods is a quintessential form of commercial speech under established first amendment jurisprudence. See, e.g., *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626, 637, 105 S. Ct. 2265, 85 L. Ed. 2d 652 (1985). At the same time, it is equally well settled that commercial speech that proposes an illegal transaction or that promotes or encourages an unlawful activity does not enjoy the protection of the first amendment. See, e.g., *Village of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982); *Pittsburgh Press Co.* v. *Pittsburgh Commission on Human Relations*, 413 U.S. 376, 388–89, 93 S. Ct. 2553, 37 L. Ed. 2d 669 (1973); see also *Thompson* v. *Western States Medical Center*, 535 U.S. 357, 367, 122 S. Ct. 1497, 152 L. Ed. 2d 563 (2002); *Lamar Outdoor Advertising, Inc.* v. *Mississippi State Tax Commission*, 701 F.2d 314, 321–22 (5th Cir. 1983). In reviewing the propriety of a motion to strike, we are obligated to assume the truth of the facts pleaded in the operative complaint. See, e.g., *Himmelstein* v. *Windsor*, supra, 304 Conn. 307. The plaintiffs' complaint in the present case alleges that the marketing in question promoted unlawful activity, namely, the civilian use of the XM15-E2S "as a combat weapon . . . for the purpose of waging war and killing human beings." Accordingly, the first amendment is not implicated by the claims as set forth by the plaintiffs in their complaint.

[57] We note that the Second Circuit, in considering whether a criminal nuisance statute of general applicability qualified as a predicate statute, indicated that the relevant legal question is whether a statute is applicable to the sale or marketing of firearms as applied to the particular circumstances of the case at issue, rather than facially applicable. See *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d 401 (discussing whether state statute at issue had been applied to firearms suppliers "for conduct like that complained of by the [plaintiff]"); id., 400–401 n.4 (in future, another statute of general applicability may be found to govern specific conduct complained of and, thus, qualify as predicate statute). We agree that that is the proper lens through which to consider the question, especially with respect to a statute such as CUTPA, which authorizes a cause of action that encompasses a number of distinct legal theories and principles. See 12 R. Langer et al., supra, § 2.1, p. 13.

[58] Similar principles and presumptions apply if the issue is framed in terms of whether PLCAA preempts the plaintiffs' CUTPA action. As the United States Supreme Court recently explained, "[a]mong the background principles of construction that our cases have recognized are those grounded in the relationship between the [f]ederal [g]overnment and the [s]tates under [the United States] [c]onstitution. It has long been settled, for example, that we presume federal statutes do not . . . preempt state law . . . ." (Citations omitted.) *Bond* v. *United States*, 572 U.S. 844, 857–58, 134 S. Ct. 2077, 189 L. Ed. 2d 1 (2014). The court further explained: "Closely related . . . is the [well established] principle that it is incumbent [on] the . . . courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers. . . . [W]hen legislation affect[s] the federal balance, the requirement of clear statement [ensures] that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." (Citations omitted; internal quotation marks omitted.) Id., 858. These principles apply with particular force to congressional legislation that potentially intrudes into a

field, such as advertising, that traditionally has been occupied by the states. See *Altria Group, Inc.* v. *Good,* supra, 555 U.S. 77.

[59] See, e.g., 151 Cong. Rec. 19,119 (2005), remarks of Senator John Thune; id., 19,120, remarks of Senator Larry Edwin Craig.

[60] In part III of his dissenting opinion, Justice Robinson makes a similar point, although framed in terms of the closely related canon of noscitur a sociis.

[61] With respect to the unlawful buyer exception set forth in 15 U.S.C. § 7903 (5) (A) (iii) (II), the referenced subsections of 18 U.S.C. § 922 prohibit various persons, including convicted felons, illegal immigrants, and individuals indicted for felonies or addicted to controlled substances, from shipping, transporting, or receiving firearms in interstate commerce. 18 U.S.C. §§ 922 (g) and (n) (2012). The unlawful buyer exception thus directly references federal statutes that specifically regulate trade in firearms. Although the record keeping exception set forth in 15 U.S.C. § 7903 (5) (A) (iii) (I) does not expressly reference any specific statute, the language of that provision closely mirrors that of 18 U.S.C. § 922 (m), which mandates compliance with the record keeping requirements that govern federally licensed firearms dealers. Moreover, the legislative history indicates that Congress drafted 15 U.S.C. § 7903 (5) (A) (iii) (I) with an eye toward regulations such as 27 C.F.R. § 478.39a (a) (1), which mandates that licensed firearms dealers report lost or stolen weapons to the federal Bureau of Alcohol, Tobacco, Firearms and Explosives no more than forty-eight hours after the loss or theft is discovered. See 151 Cong. Rec. 18,937–38 (2005), remarks of Senator Larry Edwin Craig.

[62] See 151 Cong. Rec. 23,262 (2005), remarks of Representative Christopher Van Hollen; see also id., 23261 remarks of Representative Frank James Sensenbrenner, Jr.

[63] 151 Cong. Rec. 23,263 (2005), remarks of Representative Christopher Van Hollen.

[64] See, e.g., 151 Cong. Rec. 19,131 (2005), remarks of Senator Barbara Boxer; id., 23,278, remarks of Representative Rahm Emanuel.

[65] See 151 Cong. Rec. 17,372–73 (2005), remarks of Senator John Reed; id., 23,263, remarks of Representative Christopher Van Hollen; H.R. Rep. No. 108-59, p. 98 (2003); J. Jiang, "Regulating Litigation Under the Protection of Lawful Commerce in Arms Act: Economic Activity or Regulatory Nullity?," 70 Alb. L. Rev. 537, 539–40 (2007).

[66] See, e.g., 151 Cong. Rec. 18,937 (2005), remarks of Senator Larry Edwin Craig (dealer violated federal record keeping laws); id., 19,128, remarks of Senator Kathryn Ann Bailey Hutchison (dealer violated laws); id., 23,261, remarks of Representative Frank James Sensenbrenner, Jr. (arguing that plaintiffs could have established record keeping violations and noting that federal Bureau of Alcohol, Tobacco, Firearms and Explosives report documented more than 300 such violations by dealer); see also id., 18,112, remarks of Senator John William Warner (noting that both snipers were legally barred from purchasing firearms).

[67] See, e.g., 151 Cong. Rec. 23,020 (2005), remarks of Representative Phil Gingrey ("[t]his exception would specifically allow lawsuits against firearms dealers such as the dealer whose firearm ended up in the hands of the [Beltway] snipers who failed to maintain a required inventory list necessary to ensure that they are alerted to any firearm thefts"); id., 23,273, remarks of Representative Frank James Sensenbrenner, Jr. ("this exception would specifically allow lawsuits against firearms dealers such as the dealer whose firearm ended up in the hands of the [Beltway] snipers"); see also id., 18,066, remarks of Senator Dianne Feinstein (acknowledging that "new modifications" to legislation were directed toward sniper case); id., 18,941, remarks of Senator Barbara Ann Mikulski (alluding to Beltway snipers in debating legislation).

[68] See, e.g., *Ali* v. *Federal Bureau of Prisons,* 552 U.S. 214, 226–27, 128 S. Ct. 831, 169 L. Ed. 2d 680 (2008); *Watt* v. *Western Nuclear, Inc.,* 462 U.S. 36, 44 n.5, 103 S. Ct. 2218, 76 L. Ed. 2d 400 (1983); *Millsap* v. *Andrus,* 717 F.2d 1326, 1329 n.5 (10th Cir. 1983); *United States* v. *Kaluza,* Docket No. 12-265, 2013 WL 6490341, *21–23 (E.D. La. December 10, 2013), aff'd, 780 F.3d 647 (5th Cir. 2015).

[69] We further observe that, during the legislative debates surrounding PLCAA, the author and various cosponsors of the proposed legislation repeatedly emphasized that it must be narrowly construed and that it protects only those firearms sellers who have not engaged in any illegal or irresponsible conduct. See, e.g., 151 Cong. Rec. 17,371 (2005), remarks of Senator Jefferson Beauregard Sessions III, id., 18,044, remarks of Senator

Craig; id., 18,911, remarks of Senator Craig; id., 19,137, remarks of Senator Craig; id., 23,266, remarks of Representative Clifford Bundy Stearns.

[70] See S. 908, 109th Cong. (2005); H.R. 554, 109th Cong. (2005).

[71] See 1 N. Singer & J. Singer, Statutes and Statutory Construction (New Ed. 2010) § 11:14, p. 565 ("[committee] report is of great significance for purposes of statutory interpretation"); 2A N. Singer & S. Singer, supra, § 48:6, p. 585 ("courts generally view committee reports as the 'most persuasive indicia' of legislative intent"); 2A N. Singer & S. Singer, supra, § 48:6, pp. 588–89 (legislative intent clearly expressed in committee report trumps rules of textual construction, such as ejusdem generis).

[72] Notably, all but one of the thirty-two sponsors and cosponsors of S. 908 also cosponsored S. 397, 109th Cong. (2005), the bill that ultimately became PLCAA, and the sponsor of each bill cosponsored the other.

[73] See, e.g., 151 Cong. Rec. 18,099 (2005), remarks of Senator Christopher John Dodd.

[74] 151 Cong. Rec. 18,058 (2005), remarks of Senator Coburn; id., 18,084, 18,100, 19,135, remarks of Senator Craig; id., 18,941–42, remarks of Senator Richard John Santorum; id., 19,118–19, remarks of Senator John Thune; id., 19,119, remarks of Senator Jefferson Beauregard Sessions III; id., 23,268, remarks of Representative Robert William Goodlatte; id., 23,278, remarks of Representative John J. H. Schwarz; see also *Cincinnati* v. *Beretta U.S.A. Corp.*, 95 Ohio St. 3d 416, 417, 768 N.E.2d 1136 (2002) (recognizing "[the] growing number of lawsuits brought by municipalities against gun manufacturers and their trade associations to recover damages associated with the costs of firearm violence incurred by the municipalities").

[75] The House report on a substantially similar bill introduced during the 107th Congress explained the need for the legislation as follows: "There are a number of legal theories under which plaintiffs are arguing [that] the firearms industry should be held responsible, including improper or defective distribution, unsafe design or product liability, and public nuisance. To date, every case that has been litigated to conclusion has been dismissed . . . ." H.R. Rep. No. 107-727, pt. 1, p. 4 (2002). Notably, wrongful marketing claims are not identified among the category of legal theories that Congress sought to preclude.

[76] The cosponsors further emphasized that plaintiffs in the cases of concern were seeking legislative type equitable remedies, such as purchase limits or restrictions on sales to small gun dealers. See, e.g., 151 Cong. Rec. 18,103 (2005), remarks of Senator Baucus; see also id., 18,059, remarks of Senator Coburn.

[77] See, e.g., 151 Cong. Rec. 17,370 (2005), remarks of Senator Sessions; id., 18,942, remarks of Senator Richard John Santorum; id., 19,119, 19,129, remarks of Senator Orrin Grant Hatch; id., 19,120, remarks of Senator Craig;

[78] See, e.g., 151 Cong. Rec. 19,120 (2005), remarks of Senator Craig; id., 23,267, remarks of Representative Mike Pence; id., 23,273, remarks of Representative Frank James Sensenbrenner, Jr.

[79] We note, however, that there also is ample precedent for recognizing wrongful marketing claims of this sort predicated on tort theories of liability. See, e.g., *Braun* v. *Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1112, 1114, 1122 (11th Cir. 1992) (affirming judgment for plaintiff under Georgia common law when defendants published advertisement in which "mercenary" offered "[discreet] gun for hire," resulting in murder of plaintiffs' decedent), cert. denied, 506 U.S. 1071, 113 S. Ct. 1028, 122 L. Ed. 2d 173 (1993); *Merrill* v. *Navegar, Inc.*, supra, 26 Cal. 4th 491 and n.9 (leaving open possibility that California law recognizes cause of action for negligent advertising premised on immoral promotion of criminal use of firearms); *Bubalo* v. *Navegar, Inc.*, Docket No. 96 C 3664, 1997 WL 337218, *9 (N.D. Ill. June 13, 1997) (determining that Illinois law recognizes cause of action for negligent marketing of assault pistols for criminal purposes but holding that plaintiffs had failed to plead sufficient facts to establish causation), modified on other grounds, 1998 WL 142359 (N.D. Ill. March 20, 1998); *Moning* v. *Alfono*, 400 Mich. 425, 432, 254 N.W.2d 759 (1977) (question of whether marketing slingshots directly to children creates unreasonable risk of harm was for jury to resolve).

[80] We further observe that, during the legislative debates, supporters of the bill that became PLCAA frequently stated that more than one half of the states in the country already had adopted similar laws and that PLCAA was necessary primarily to establish uniform national standards and to ensure that frivolous actions were not filed in the minority of jurisdictions that had not enacted such protections. See, e.g., 151 Cong. Rec. 17,370 (2005), remarks of Senator Sessions; id., 23,020, remarks of Representative

Phil Gingrey; id., 23,024, remarks of Representative Charles Foster Bass; id., 23,265, remarks of Representative Frederick C. Boucher; see also *Ileto* v. *Glock, Inc.*, supra, 565 F.3d 1136 (noting "Congress' intention to create national uniformity" in enacting PLCAA). As the author of a virtually identical House bill explained, "[t]he bill we are considering today is designed to simply mirror these [s]tates and what they have done to provide a unified system of laws . . . ." 151 Cong. Rec. 23,266, remarks of Representative Clifford Bundy Stearns.

Notably, most of the state laws to which PLCAA was analogized, by their terms, bar only actions against firearms sellers brought by municipalities and other public entities. See H.R. Rep. No. 108-59, p. 16 (2003). Indeed, legislators recognized that "[m]any [states'] immunity statutes only limit the ability of cities, counties, and other local governments to sue [gun manufacturers and sellers]." Id. Moreover, of the state laws that provide broader immunity to firearms sellers, many govern only product liability actions; see, e.g., Idaho Code Ann. § 6-1410 (2004); N.C. Gen. Stat. § 99B-11 (2017); S.C. Code Ann. § 15-73-40 (2005); Tex. Civ. Prac. & Rem. Code Ann. § 82.006 (b) (West 2017); Wn. Rev. Code Ann. § 7.72.030 (1) (a) (West 2017); whereas others permit actions alleging the violation of any state law. See, e.g., Ohio Rev. Code Ann. § 2305.401 (B) (3) (West 2017); see also Mich. Comp. Laws Serv. § 28.435 (7) (LexisNexis 2015) ("[a] federally licensed firearms dealer is not liable for damages arising from the use or misuse of a firearm if the sale complies with this section, any other applicable law of this state, and applicable federal law"). Accordingly, very few of the state laws on which legislators purported to model PLCAA would even potentially bar the types of wrongful marketing claims at issue in the present action.

[81] See, e.g., 151 Cong. Rec. 18,085 (2005), remarks of Senator Craig; id., 18,914, remarks of Senator Kathryn Ann Bailey Hutchison; id., 18,942, remarks of Senator Richard John Santorum.

[82] See, e.g., 151 Cong. Rec. 17,370–71 (2005), remarks of Senator Sessions ("Why would the manufacturer or seller of a gun who is not negligent, who obeys all of the applicable laws—we have a host of them—be held accountable . . . ? . . . I don't understand how . . . [a product that is] sold according to the laws of the United States [can create legal liability] for an intervening criminal act."); id., 17,371, remarks of Senator Sessions ("Manufacturers and sellers are still responsible for their own negligent or criminal conduct and must operate entirely within the complex [s]tate and [f]ederal laws. . . . Plaintiffs can go to court if the gun dealers do not follow the law . . . ."); id., 17,377, remarks of Senator Sessions ("Under this bill, I think it is very important to note that you can sue gun sellers and manufacturers who violate the law. It is crystal clear in the statute that this is so."); id., 17,390, remarks of Senator Orrin Grant Hatch ("This bill is not a license for the gun industry to act irresponsibly. If a manufacturer or seller does not operate *entirely* within [f]ederal or [s]tate law, it is not entitled to the protection of this legislation." [Emphasis added.]); id., 18,059, remarks of Senator Coburn ("[m]anufacturers and sellers are still responsible for their own negligent or criminal conduct and must operate *entirely* within the [f]ederal and [s]tate laws" [emphasis added]); id., 18,103, remarks of Senator Baucus (bill confers immunity on "[b]usinesses that comply with *all* applicable [f]ederal and [s]tate laws" [emphasis added]); id., remarks of Senator Baucus ("This bill . . . will not shield the industry from its own wrongdoing or from its negligence . . . . For example, the bill will not require dismissal of a lawsuit if a member of the industry breaks the law . . . ."); id., 18,942, remarks of Senator Richard John Santorum (PLCAA is "narrowly crafted" law that continues to hold responsible "individuals and companies that knowingly violate the law"); id., 19,118–19, remarks of Senator John Thune ("This bill . . . [protects] innocent . . . gun manufacturers and gun dealers . . . who have abided by the law . . . [but] allows suits against manufacturers . . . for violating a law in the production or sale of a firearm . . . . These are not arbitrary standards . . . . They are established legal principles that apply across the board to all industries."); id., 23,020, remarks of Representative Phil Gingrey (exception applies to violations of "a [s]tate or [f]ederal statute applicable to sales or marketing"); id., 23,265, remarks of Representative Frederick C. Boucher ("[t]he bill . . . does not affect suits against anyone who has violated other [s]tate or [f]ederal laws"); id., 23,266, remarks of Representative Clifford Bundy Stearns ("[T]his legislation is very narrowly tailored to allow suits against any bad actors to proceed. It includes carefully crafted exceptions . . . for . . . criminal behavior by a gun maker or seller . . . ."); id., 23,274, remarks of Representative Frank James Sensenbrenner, Jr. ("This is a carefully crafted bill. It provides immu-

nity for people who have not done anything wrong . . . but it does allow lawsuits to proceed against the bad actors."); id., remarks of Representative Steny Hamilton Hoyer (bill provides immunity "unless a manufacturer or seller of arms acts in some wrongful or criminal way").

[83] See, e.g., 151 Cong. Rec. 2561 (2005) ("These lawsuits are based [on] the notion that even though a business complies with *all* laws and sells a legitimate product, it should be held responsible . . . . [PLCAA] specifically provides that actions based on the wrongful conduct of those involved in the business of manufacturing and selling firearms would not be affected by this legislation. The bill is solely directed to stopping abusive, politically driven litigation . . . ." [Emphasis added.]); id., 18,057 ("[t]his bill gives specific examples of lawsuits not prohibited . . . lawsuits based on violations of [state] and [f]ederal law"); id., 18,057–58 ("Any manufacturer, distributor, or dealer who knowingly violates *any* [s]tate or [f]ederal law can be held civilly liable under the bill. This bill does not shut the courthouse door. . . . Current cases [in which] a manufacturer, distributor, or dealer knowingly violates a [s]tate or [f]ederal law will not be thrown out." [Emphasis added.]); id., 18,061 ("[This bill] does not protect firearms . . . manufacturers, sellers or trade associations from any lawsuits based on their own negligence or criminal conduct. The bill gives specific examples of lawsuits not prohibited. Let me repeat, not prohibited: Product liability . . . [n]egligence or negligent entrustment, breach of contract, lawsuits based on a violation of [s]tate and [f]ederal law, it is very straightforward, and we think it is very clear."); id., 18,085 ("Finally, this bill does not protect any member of the gun industry from lawsuits for harm resulting from *any illegal actions* they have committed. Let me repeat it. If a gun dealer or manufacturer violates the law, this bill is not going to protect them . . . ." [Emphasis added.]); id., 18,096 ("[i]f manufacturers or dealers break the law or commit negligence, they are still liable"); id., 18,911 ("this legislation [has come] to the floor to limit the ability of junk or abusive kinds of lawsuits in a very narrow and defined way, but in no way—and I have said it very clearly—denying the recognition that if a gun dealer or a manufacturer acted in an illegal or irresponsible way . . . this bill would not preempt or in any way protect them"); id., 19,136–37 ("[t]his bill will not prevent a single victim from obtaining relief for wrongs done to them by anyone in the gun industry"); id., 19,137 ("This bill is intended to do one thing, and that is to end the abuse that is now going on in the court system of America against law-abiding American businesses when they violate *no* law. . . . But if that law-abiding citizen violates the law . . . then they are liable." [Emphasis added.]).

[84] Indeed, Senator Craig suggested during the legislative debates that a law as broadly applicable as a local zoning regulation could qualify as a predicate statute. See 151 Cong. Rec. 18,096 (2005).

[85] As the amici Newtown Action Alliance and Connecticut Association of Public School Superintendents stated in their amicus brief, at the time of the Sandy Hook massacre, Lanza owned a computer game entitled "School Shooting," in which the player enters a school and shoots at students.